[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *State v. Graham*, Slip Opinion No. 2020-Ohio-6700.]

NOTICE

This slip opinion is subject to formal revision before it is published in an advance sheet of the Ohio Official Reports.  Readers are requested to promptly notify the Reporter of Decisions, Supreme Court of Ohio, 65 South Front Street, Columbus, Ohio 43215, of any typographical or other formal errors in the opinion, in order that corrections may be made before the opinion is published.

SLIP OPINION NO. 2020-OHIO-6700

THE STATE OF OHIO, APPELLEE, *v.* GRAHAM, APPELLANT.

**[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *State v. Graham*, Slip Opinion No. 2020-Ohio-6700.]**

*Criminal law—Aggravated murder—Aggravating circumstances do not outweigh mitigating factors—Convictions affirmed, death sentence vacated, and cause remanded for resentencing.*

(No. 2016-1882—Submitted October 22, 2019—Decided December 17, 2020.)

APPEAL from the Court of Common Pleas of Portage County,

No. 2016 CR 107 E.

_____

FISCHER, J.

## I.  INTRODUCTION

{¶ 1} This is an appeal of right from an aggravated-murder conviction and death sentence.  A Portage County jury found appellant, Damantae Graham, guilty of multiple offenses, including aggravated murder and three accompanying death-penalty specifications: committing the aggravated murder during an aggravated robbery, an aggravated burglary, and a kidnapping.  The jury recommended a

sentence of death, and the trial court accepted the recommendation and sentenced Graham accordingly. For the reasons that follow, we affirm Graham's convictions but vacate his death sentence and remand the cause to the trial court for resentencing consistent with this opinion.

## II. GUILT-PHASE EVIDENCE

{¶ 2} Evidence introduced at trial showed that Graham, a 19-year-old, shot Nicholas Massa during the robbery of an apartment in Kent, Ohio. The state presented the testimony of, among others, the two surviving robbery victims and Graham's three codefendants.

### A. Kremling plans to rob Haithcock

{¶ 3} Connor Haithcock, a 19-year-old, and Justin Lewandowski, a 20-year-old Kent State University student, were roommates at the Ryan Place apartments in Kent. Massa, an 18-year-old Kent State University student, often visited the apartment.

{¶ 4} Haithcock sold marijuana and "dabs," a concentrated form of tetrahydrocannabinol, also known as THC, from the apartment. Haithcock sold marijuana to 17-year-old Ty Kremling, his former high school classmate, on two occasions. On those occasions, Kremling noticed that Haithcock kept marijuana and a significant amount of money in a lockbox in the apartment.

{¶ 5} Soon after his second purchase of marijuana, Kremling decided to rob Haithcock. On Super Bowl Sunday, February 7, 2016, he began planning the robbery for later that day. Kremling asked two of his friends, Graham and 17-year-old Marquis Grier, if they would like to take part in a robbery. Kremling told them it would be easy, and he shared details with them: the location of the apartment, the valuable items in the apartment, and the intended target of the crime (Haithcock) and how he knew him. Graham and Grier agreed to participate.

{¶ 6} Kremling then called 17-year-old Anton Planicka, a friend who owned a truck. Kremling told Planicka that he needed a ride to Kent to commit a

robbery. Planicka later testified that Kremling had told him it was a "sure thing" and had asked him if he "wanted in on it." Planicka agreed to participate.

{¶ 7} Kremling, Grier, Graham, and Planicka met at a house on McElrath Avenue in Ravenna. According to Planicka, Kremling said they were going to take everything from Haithcock. Planicka testified, "He [Kremling] said that he'd been there over the weekend and they had an Xbox One and money and drugs." They planned to use bandanas and hoodies cinched tightly to cover their faces. According to Grier, he and Graham each had a .380-caliber High Point semiautomatic handgun to use during the robbery.

**B. Massa is killed during the planned robbery**

{¶ 8} On the afternoon of February 7, Haithcock, Lewandowski, and Massa were at Haithcock's and Lewandowski's apartment. Haithcock and Massa were playing Xbox, and Lewandowski was hanging decorations on the wall, using a hammer.

{¶ 9} Shortly before 4:00 p.m., Planicka, Kremling, Grier, and Graham arrived at the Ryan Place apartment building. Planicka backed into a parking space at a nearby business and stayed in the truck. Kremling, Graham, and Grier entered the building, partially covered their faces with bandanas and hoodies as planned, and proceeded to Haithcock's and Lewandowski's third-floor apartment. Despite their disguises, Kremling, Grier, and Graham could be distinguished from each other by their physical characteristics: Kremling is tall and light-skinned, Grier is shorter than Kremling and is light-skinned, and Graham is short and dark-skinned.

{¶ 10} According to Kremling, Graham knocked on the apartment door and Lewandowski opened it. Graham and Grier barged into the living room with their guns drawn. Graham ordered Lewandowski to drop the hammer he was holding. He dropped it and put his hands in the air.

{¶ 11} Graham ordered Haithcock, Lewandowski, and Massa to sit on the living-room couches. According to Haithcock, the short, dark-skinned man (later

identified as Graham) was doing the talking. He asked Haithcock, "Where's the money[?] [W]here's the dope[?]" Haithcock said that it was all in the lockbox on the kitchen table. Grier took the dabs and marijuana from the lockbox. Graham put a gun to Haithcock's head demanding money. Haithcock gave Graham $500 or $600 from his pocket. The robbers then demanded more money.

{¶ 12} Haithcock told the robbers that there might be more money in his bedroom. Graham told Grier to take Haithcock to the bedroom to look. Kremling accompanied them. Meanwhile, Graham stayed in the living room guarding Massa and Lewandowski, who remained seated on the couch with their hands up. At trial, Lewandowski described what happened next:

> Nick [Massa] looked over at me and the short, dark-skinned male [Graham] said, what the f[—-] are you looking at him for? If you look over at him again I'm gonna shoot you. And Nick immediately replied you're not going to shoot me. And as soon as he did that, the short, dark-skinned male shot him [in the chest].

## C. Perpetrators flee the scene and split up

{¶ 13} After hearing the gunshot, Grier and Kremling hurried into the living room and saw that Massa had been shot. According to Kremling, Grier asked Graham if he had just shot him, and Graham said, "[Y]eah." The three of them ran out of the apartment and fled in Planicka's truck. According to Planicka, Grier asked Graham, "[W]hy do you have to always be doing hot sh[—] like that[?]" and Graham replied, "He thought sh[—] was sweet and I wasn't playing." Graham then gave each of them $100, from what he had taken from Haithcock.

{¶ 14} They returned to the house in Ravenna, where they divided up the marijuana. Graham told them that they did not have to worry about getting caught, because the gun had jammed, so the shell casing had not ejected. He showed them

the casing. The four of them left the house separately. Graham told Grier a couple days later that he had broken up the gun and thrown it in a wooded area.

### D. Police investigation

{¶ 15} After the three robbers left his apartment, Lewandowski called 9-1-1 and reported the shooting. Haithcock got on the phone and told the operator that Ty Kremling was one of the robbers. During the trial, Haithcock testified that he had recognized Kremling by "[h]is height, * * * his build, the way he carried himself, [and] the way he walked." Shortly after the 9-1-1 call, the police and medics arrived, and Massa was pronounced dead at the scene.

{¶ 16} On the afternoon of February 7, Detective Richard Soika began looking for Kremling and the getaway truck—Planicka's green, four-door truck had been captured on video by a camera positioned near Haithcock's and Lewandowski's apartment. Soika contacted AT&T and requested that he receive alerts on the location of Kremling's phone. Police located Kremling in the Stow area and arrested him. The next morning, Kremling admitted his involvement in the robbery. Kremling said that he had not intended to kill anyone but that he had intended to rob Haithcock for drugs and money. Kremling would not disclose the names of the other perpetrators.

{¶ 17} On February 8, the police learned that Planicka had been the getaway driver. Further investigation identified Graham and Grier as suspects, and the police obtained their physical descriptions and photos. On February 10, Grier was arrested. Grier admitted his involvement in the robbery but claimed he had not expected anyone to get hurt. Meanwhile, the police learned that Graham was staying at a house in Ravenna, and a task force found him hiding in a room inside that house.

{¶ 18} On February 12, Soika interviewed Graham at the Portage County sheriff's office. Graham said, "I wasn't there," when he was questioned about his involvement in the robbery and murder.

**E. Medical examiner's testimony**

{¶ 19} Dr. George Sterbenz, the chief deputy medical examiner for Summit County, conducted Massa's autopsy. He testified that Massa died from a single bullet that entered his chest and traveled at a downward angle through his heart, aorta, and left lung. Dr. Sterbenz stated that the wound was consistent with the shooter's having stood over Massa while he was seated. Based on the injuries to Massa's body and the lack of gunshot residue on Massa's clothing, Dr. Sterbenz said that the muzzle of the handgun was at least six inches from Massa when he was shot.

## III. PROCEDURAL HISTORY

{¶ 20} The state charged Graham with one count of aggravated murder and five noncapital counts. In Count 1, the state charged Graham with the aggravated murder of Massa during an aggravated robbery, aggravated burglary, or kidnapping. Count 1 contained three death-penalty specifications, all under R.C. 2929.04(A)(7): (1) aggravated murder during an aggravated robbery, (2) aggravated murder during an aggravated burglary, and (3) aggravated murder during a kidnapping.

{¶ 21} Regarding the five additional counts, the state charged Graham with aggravated burglary in Count 2, aggravated robbery in Count 3, kidnapping Haithcock in Count 4, kidnapping Lewandowski in Count 5, and kidnapping Massa in Count 6. Each count also included a firearm specification.

{¶ 22} Graham pleaded not guilty to all the charges. The jury found Graham guilty of all charges and specifications, and it recommended that he be sentenced to death. The trial judge accepted the recommendation and sentenced Graham accordingly. Graham was also sentenced to serve 11 years in prison on each of the noncapital counts and to serve a total of six years in prison on the firearm specifications, for a total of 61 years.

## IV. ISSUES RAISED ON APPEAL

{¶ 23} Graham's appeal raises 14 propositions of law. We will address the issues raised in those propositions in the approximate order that they arose during the proceedings.

### A. Defense counsel failed to show particularized need for grand-jury transcripts

{¶ 24} In proposition of law No. VIII, Graham argues that defense counsel were ineffective because they made no effort to show a particularized need to obtain the grand-jury transcripts. To prevail on this claim, Graham must show that counsel's performance was deficient and that a reasonable probability exists that but for counsel's errors, the result of the proceeding would have been different. *Strickland v. Washington*, 466 U.S. 668, 687-688, 694, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); *State v. Bradley*, 42 Ohio St.3d 136, 538 N.E.2d 373 (1989), paragraphs two and three of the syllabus.

{¶ 25} We have recognized a limited exception to the general rule of grand-jury secrecy: an accused is not entitled to review the transcript of grand-jury proceedings "unless the ends of justice require it and there is a showing by the defense that a particularized need for disclosure exists which outweighs the need for secrecy." *State v. Greer*, 66 Ohio St.2d 139, 420 N.E.2d 982 (1981), paragraph two of the syllabus. A particularized need is established "when the circumstances reveal a probability that the failure to provide the grand jury testimony will deny the defendant a fair trial." *State v. Sellards*, 17 Ohio St.3d 169, 173, 478 N.E.2d 781 (1985). Determining whether a particularized need exists is a matter within the trial court's discretion. *Greer* at paragraph one of the syllabus.

#### 1. Defense counsel requested the grand-jury transcripts

{¶ 26} Defense counsel filed pretrial motions to (1) transcribe the grand-jury proceedings, (2) disclose the names of the witnesses who testified before the grand jury, and (3) obtain a transcript of the grand-jury proceedings. The trial court

denied all three motions because defense counsel failed to show a particularized need.

{¶ 27} Subsequently, defense counsel filed a motion for reconsideration of the three motions, arguing:

Upon information and belief, persons who testified before the grand jury have also given statements to law enforcement officers, or to others who gave the information to the State's agents; and it is highly probable that those persons who testified before the Grand Jury will also be called to testify for the prosecution at trial. Their testimony before the grand jury may be inconsistent with the other statements that they have made.

At a hearing on this motion, the prosecutor argued: "[T]here has been no showing of any particularized need for this testimony. And I will represent to the Court that the co-defendants [Kremling, Grier, and Planicka] did not testify at [the] grand jury." The trial court denied the motion for reconsideration.

### 2. Analysis

{¶ 28} Graham argues that defense counsel failed to raise the proper arguments to establish a particularized need for the grand-jury transcripts. He contends that counsel should have argued that a particularized need existed (1) based on the possibility that he was indicted on the false testimony of a codefendant, (2) based on the possibility that his codefendants' trial testimonies would be inconsistent with their grand-jury testimonies, and (3) because the grand-jury testimony of a codefendant might implicate another person who may have been the shooter. Graham argues that he is "entitled to a new trial with instructions to provide the grand jury transcript to look for inconsistencies in the *testimony of any of the co-defendants* who implicated him as the shooter." (Emphasis added.)

8

{¶ 29} Here, there is no possibility that Graham's codefendants gave false grand-jury testimony or grand-jury testimony inconsistent with their trial testimony, because, according to the prosecutor, none of Graham's codefendants testified before the grand jury. The prosecutor was aware that the state had the duty to disclose such information, if it indeed existed, given Graham's written request, under Crim.R. 16(B)(1). Because none of Graham's codefendants testified before the grand jury, counsel cannot be found deficient for failing to present a sufficient argument to demonstrate a particularized need for the nonexistent grand-jury testimony. Thus, Graham fails to show that defense counsel were deficient.

{¶ 30} Based on the foregoing, we reject proposition of law No. VIII.

### B. Jury pool was tainted by racial slurs and racist comments

{¶ 31} In proposition of law No. I, Graham argues that three prospective jurors made racial slurs and racist comments during individual voir dire and that the trial court erred by failing to convene a new jury pool due to such comments. However, defense counsel failed to object to the jury pool at trial and thus forfeited all but plain error. To prevail, Graham must show that an error occurred, that the error was plain, and that the error affected the outcome of the trial. *State v. Barnes*, 94 Ohio St.3d 21, 27, 759 N.E.2d 1240 (2002). Graham also argues that defense counsel were ineffective by failing to request a new jury pool.

### 1. Racist comments and racial slurs during voir dire

#### a. Prospective juror No. 38

{¶ 32} Prospective juror No. 38 stated in her jury questionnaire, "Do not like n[——-]s," in response to the question, "Do you have any specific health problems of a serious nature that might make it difficult or uncomfortable for you to sit as a juror in this case?"

{¶ 33} During individual voir dire, defense counsel brought prospective juror No. 38's questionnaire response to the trial court's attention. Under questioning, prospective juror No. 38 explained, "Attitude. It's an attitude. I

believe there's white and there's black. It has nothing to do with color. * * * I see it where I work every day. * * * [P]eople come in and they just * * * don't care about other people; just a bad attitude."

{¶ 34} During general voir dire, prospective juror No. 38 was questioned outside the presence of other jurors. She again explained her use of the N-word, stating, "[I]t's not a racial thing. I am not prejudice in any way." She added: "[T]here's white people and black people and white n[——-]s and black n[——-]s and Hispanic. I don't mean that as in disrespect." Prospective juror No. 38 was later excused for cause.

### b. Prospective juror No. 195

{¶ 35} During individual voir dire, the trial court excused prospective juror No. 195 because the prospective juror indicated he would lean toward imposing a death sentence if the jury found the defendant guilty. The following day, prospective juror No. 187 informed the court that prospective juror No. 195 made a derogatory comment that included a racial slur in the presence of their small-group panel before prospective juror No. 195 was excused. Prospective juror No. 187 reported that prospective juror No. 195 had stated, "I wonder how much we paid for that n[——-]'s suit."

{¶ 36} Under questioning, prospective juror No. 187 stated that having heard the comment would not affect her ability to be fair and impartial. The trial court then questioned the four remaining prospective jurors from that small-group panel. Prospective juror No. 185 had heard nothing derogatory. Prospective juror Nos. 188, 193, and 194 had heard the comment, but each stated that the comment would not affect his or her ability to be fair and impartial. None of the prospective jurors who heard prospective juror No. 195's comment served on the jury.

### c. Prospective juror No. 64

{¶ 37} During individual voir dire, the prosecutor questioned prospective juror No. 64 about his views on the death penalty:

10

> [The prosecutor]: * * * So the imposition of the death penalty is not automatic; is it in your mind?
>
> Prospective Juror: No. You can't just go out and lynch somebody like, you know, in 1835 or something.
>
> [The prosecutor]: Okay. Fair enough.
>
> Prospective Juror: I watch a lot of *Gunsmoke.*

Defense counsel later used a peremptory challenge to remove prospective juror No. 64 from the panel.

### 2. Analysis

{¶ 38} There is no presumption that an entire jury panel is tainted when a prospective juror makes improper comments in the presence of other prospective jurors. *State v. Adams*, 144 Ohio St.3d 429, 2015-Ohio-3954, 45 N.E.3d 127, ¶ 149-150. The party challenging the entire jury panel has the burden to show either that the jurors were unlawfully empaneled or that they could not be fair and impartial. *Id*. at 150. But nothing in the record supports either finding.

### a. Racist comments and racial slurs did not taint the jury

{¶ 39} Graham argues that other prospective jurors may have been present in the jury room while prospective juror No. 38 was being questioned and may have overheard her racist comments and racial slurs. But this assertion is not supported by the record. At the beginning of individual voir dire, the trial court informed the prospective jurors: "At this time, we are going to go back into the jury room and *you will be brought in one at a time* to be questioned by the court and then by the attorneys." (Emphasis added.) And before prospective juror No. 38 was questioned, the court reporter noted: "Individual voir dire conducted in the jury room, *outside the presence* of other prospective jurors." (Emphasis added.) Thus, the record does not support a finding that the jury was tainted by prospective juror

No. 38's comments and slurs, because those comments and slurs were not made or referred to in the presence of other prospective jurors.

{¶ 40} As for prospective juror No. 195, at least four prospective jurors heard his derogatory comment while they were waiting to be questioned. But because prospective juror No. 195 was the last prospective juror to be questioned during individual voir dire, the number of prospective jurors who were able to hear his comment was quite small, as many had left the courtroom after participating in individual voir dire. Furthermore, none of those prospective jurors was considered for selection before the jury was seated. Thus, there is no possibility that the jury was tainted by prospective juror No. 195's comment.

{¶ 41} Graham also claims that prospective juror No. 64's comment about lynchings in 1835 was racist and may have tainted the jury. Prospective juror No. 64 explained that he had made this comment because he "watch[es] a lot of *Gunsmoke*," a TV western. But no other prospective jurors heard this comment. Thus, there is also no support that prospective juror No. 64's comment tainted the jury.

### b. Trial court conducted appropriate inquiry

{¶ 42} Graham argues that in light of the comments made by prospective juror Nos. 38, 195, and 64, the trial court should have questioned all the remaining prospective jurors to protect against a tainted jury pool. But the trial court properly addressed comments that were brought to its attention. First, the trial court questioned prospective juror No. 38 about the racial slur *on her questionnaire* outside the presence of other prospective jurors. Nothing indicates that any other prospective juror was aware of prospective juror No. 38's use of the racial slur. Second, the trial court *questioned all the prospective jurors* on the small-group panel that overheard prospective juror No. 195's derogatory comment. These jurors indicated that the comment would not have any impact on their ability to be fair and impartial. Moreover, none of these prospective jurors was seated on the jury.

{¶ 43} Graham contends that the comments made by these three prospective jurors demonstrated the need for a new jury pool. But speculation as to bias among the prospective jurors does not justify quashing the entire venire. *See London v. Scurry*, 12th Dist. Madison No. CA95-10-033, 1996 WL 406263, *2 (July 22, 1996). And Graham points to no evidence showing that any other prospective juror harbored racial bias. Thus, he has not established that the trial court should have questioned other prospective jurors about their racial views or convened a new jury pool.

{¶ 44} Graham cites *State v. Feagin*, 5th Dist. Richland No. 05 CA 1, 2006-Ohio-676, ¶ 18, in arguing that the trial court should have conducted a further inquiry to protect against a tainted jury pool. In *Feagin*, a prospective juror referred to the defendant as "the crook" during voir dire. *Id*. at ¶ 12. The trial court excused the prospective juror but did not question the remaining prospective jurors to determine whether the comment had caused them to be prejudiced against the defendant. On appeal, the Fifth District rejected the defense's claim that the trial court should have questioned the other prospective jurors, in part because defense counsel failed to show that the juror's comment "irreparably tainted the jury panel's objectivity." *Id*. at ¶ 25. Thus, *Feagin* does not support Graham's argument.

### c. Batson *does not apply*

{¶ 45} Graham invokes *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), in arguing that "issues involving racial prejudice among a jury" cause structural error and thus his conviction is subject to automatic reversal. In *Batson*, the United States Supreme Court outlined a three-part test for evaluating whether a prosecutor's use of peremptory challenges constituted a constitutional violation. *Id*. at 96. But Graham fails to explain how *Batson* applies here. Moreover, neither the prospective jurors who made the racist comments nor the prospective jurors who heard the comments were seated on the jury that decided Graham's guilt and sentence.

#### d. Counsel were not ineffective during voir dire

**{¶ 46}** As a final matter, Graham argues that defense counsel were ineffective during voir dire. To establish ineffective assistance, Graham must (1) show that counsel's performance "fell below an objective standard of reasonableness" as determined by "prevailing professional norms" and (2) demonstrate "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 688, 694, 104 S.Ct. 2052, 80 L.Ed.2d 674; *see also Bradley*, 42 Ohio St.3d 136, 538 N.E.2d 373, at paragraphs two and three of the syllabus.

**{¶ 47}** First, Graham argues that defense counsel were ineffective by failing to move for a new jury pool after some prospective jurors made racial slurs and displayed racial bias. However, defense counsel had no grounds for requesting a new jury pool after prospective juror No. 38 was excused and the prospective jurors who had heard prospective juror No. 195's derogatory comment assured the court that they could remain fair and impartial. Nothing suggested that the entire jury pool was tainted simply because two prospective jurors made racist comments. *See State v. Hairston*, 4th Dist. Scioto No. 06CA3087, 2007-Ohio-4159, ¶ 17. Thus, this ineffective-assistance-of-counsel claim lacks merit.

**{¶ 48}** Second, Graham argues that defense counsel failed to ask the prospective jurors a single question about race during voir dire. When a capital defendant is accused of interracial murder, defense counsel are "entitled to engage in racial-bias inquiry," but they are not required to do so. (Emphasis deleted.) *State v. Hale*, 119 Ohio St.3d 118, 2008-Ohio-3426, 892 N.E.2d 864, ¶ 217-218. As we have explained, "the actual decision to question on racial prejudice is a choice best left to a capital defendant's counsel." *State v. Conway*, 108 Ohio St.3d 214, 2006-Ohio-791, 842 N.E.2d 996, ¶ 33. Counsel has to "weigh the risks inherent in interrogating prospective jurors on the sensitive question of racial prejudice." *State v. Perez*, 124 Ohio St.3d 122, 2009-Ohio-6179, 920 N.E.2d 104, ¶ 207.

**{¶ 49}** Defense counsel elected not to question prospective jurors about race. But the record indicates that defense counsel were attuned to issues of racial bias. Defense counsel spotted prospective juror No. 38's racist comment on her questionnaire and brought it to the court's attention. Defense counsel also filed a motion to include additional questions on the juror questionnaire about possible racial bias. Because counsel were alert to the possibility of racial bias, their decision not to question jurors on that topic appears to have been a deliberate tactical choice.

**{¶ 50}** Nevertheless, Graham characterizes defense counsel's motion to expand the questionnaire as "a minimal effort to uncover potential racism." Graham's argument is insufficient to overcome the strong presumption that counsel "made all significant decisions in the exercise of reasonable professional judgment." *Strickland*, 466 U.S. at 690, 104 S.Ct. 2052, 80 L.Ed.2d 674.

**{¶ 51}** Under the circumstances, we hold that counsel were not deficient by failing to make further inquiry on the topic of racial bias. Moreover, Graham cannot establish prejudice, because there is no evidence that any seated juror actually harbored racial bias. *See State v. Thompson*, 141 Ohio St.3d 254, 2014-Ohio-4751, 23 N.E.3d 1096, ¶ 234.

**{¶ 52}** Based on the foregoing, we reject proposition of law No. I.

### C. Improper admission of testimony describing Graham's lack of cooperation and emotion during police interview

**{¶ 53}** In proposition of law No. V, Graham argues that police testimony about his postarrest refusal to speak to detectives violated his right to remain silent and his right to a fair trial. He also argues that defense counsel were ineffective in that they failed to object to such testimony.

1. Detective Soika's testimony

{¶ 54} During the state's case-in-chief, Detective Soika testified that he interviewed Graham after his arrest. Soika testified about Graham's demeanor during the interview:

Q [prosecuting attorney]: And can you describe for us his demeanor, what kind of characteristics he's exhibiting at this point and time?

A: Well, I've been a cop for a while, and I've interviewed a lot of people. * * * Um, after talking to the first two involved in this, I kind of—I don't know, I thought maybe I'd get some information out of Damantae * * * but I tried to talk to Damantae Graham, and I got nowhere. * * * It's hard to explain, but it's just, um, his demeanor, I mean, he didn't look nervous, he didn't blink, he didn't—

MR. BEANE [defense counsel]: Objection, Your Honor.

THE COURT: Overruled.

Q [prosecuting attorney]: Continue, please.

A: I mean, * * * trying to talk to him, it was just * * * it was pretty much like no one I've ever interviewed. I mean, usually I can talk pretty well to people and get a rapport or something, you know, some kind of a response, but it was just a blank slate, blank stare, you know. Myself, I tried to talk to him, other detectives tried to talk to him, and it was just the same, you know, blank stare, no emotion.

MR. BEANE: Your Honor, I would like for the record to reflect my continuing objection to this line of questioning.

THE COURT: It will so reflect. * * *

* * *

Q [prosecuting attorney]: Okay. Did Mr. Graham make any statements at all about his involvement when being confronted with this matter?

A: I believe the only thing he said was, "I wasn't there."

## 2. Standard of review

{¶ 55} Graham contends that we should review the admission of Soika's testimony for plain error. But because defense counsel objected to the admission of the testimony, we review any error under the harmless-error standard in Crim.R. 52(A). *State v. Perry*, 101 Ohio St.3d 118, 2004-Ohio-297, 802 N.E.2d 643, ¶ 15. Under that rule, the state bears the burden of demonstrating that the error did not affect the substantial rights of the defendant. *Id.*

## 3. Analysis

{¶ 56} Graham, citing *Doyle v. Ohio*, 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976), argues that Soika's testimony improperly used his postarrest silence against him in violation of his constitutional rights. In *Doyle*, the United States Supreme Court held that use of a defendant's postarrest post-*Miranda* silence for *impeachment* purposes violates the Due Process Clause of the Fourteenth Amendment because although "the *Miranda* warnings contain no express assurance that silence will carry no penalty, such assurance is implicit to any person who receives the warnings." *Doyle* at 618; *see Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). Further, the court held that "every post-arrest silence is insolubly ambiguous because of what the State is required to advise the person arrested." *Doyle* at 617.

{¶ 57} Ten years later, the court was confronted with the issue whether a defendant's postarrest post-*Miranda* silence was admissible as *substantive* evidence of guilt in the state's case-in-chief. *Wainwright v. Greenfield*, 474 U.S.

284, 106 S.Ct. 634, 88 L.Ed.2d 623 (1986). The court held that such use violated the defendant's due-process rights, noting that "breaching the implied assurance of the *Miranda* warnings is an affront to the fundamental fairness that the Due Process Clause requires." *Wainwright* at 291; *see also State v. Leach*, 102 Ohio St.3d 135, 2004-Ohio-2147, 807 N.E.2d 335, ¶ 16-17.

**{¶ 58}** Soika advised Graham of his *Miranda* rights at the outset of the interview, but Graham did not invoke them. Instead, he told investigators, "I wasn't there," when asked about the murder. Thus, Soika's testimony that Graham exhibited a "blank stare, no emotion" and was uncooperative during the interview was not a comment on his Fifth Amendment right to remain silent. *See State v. Davis*, 116 Ohio St.3d 404, 2008-Ohio-2, 880 N.E.2d 31, ¶ 130; *State v. Gillard*, 40 Ohio St.3d 226, 231, 533 N.E.2d 272 (1988), *abrogated on other grounds, State v. McGuire*, 80 Ohio St.3d 390, 686 N.E.2d 1112 (1997).

**{¶ 59}** We note that Soika's testimony about Graham's demeanor was permitted under Evid.R. 701, which governs opinion testimony by lay witnesses. That rule provides: "If the witness is not testifying as an expert, the witness' testimony in the form of opinions or inferences is limited to those opinions or inferences which are (1) rationally based on the perception of the witness and (2) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue."

**{¶ 60}** Soika's testimony satisfied both requirements of Evid.R. 701. Soika observed Graham's demeanor, and Graham's reactions were relevant in showing his evasiveness. *See Davis* at ¶ 118-120 (testimony that the defendant was "non-committal, very wishy washy" about whether he knew the victim when he was shown the victim's photo was relevant in demonstrating evasiveness); *State v. Hand*, 107 Ohio St.3d 378, 2006-Ohio-18, 840 N.E.2d 151, ¶ 118-125 (detective's testimony about the defendant's reaction to the news of his wives' murders admissible as lay opinion).

18

{¶ 61} Graham cites *United States v. Ursery*, 109 F.3d 1129 (6th Cir.1997), in arguing that repeated efforts to use a defendant's postarrest silence show the state's intent to violate the Fifth Amendment. *Ursery* addressed the defendant's claim that the prosecutor, during her closing argument, improperly commented on the defendant's decision not to testify. *Id*. at 1134. But *Ursery* is inapposite because Soika's testimony had nothing to do with Graham's decision not to testify.

{¶ 62} As for Graham's ineffective-assistance-of-counsel claim, that argument lacks merit because, as noted above, defense counsel did object to Soika's testimony.

{¶ 63} Based on the foregoing, we reject proposition of law No. V.

### D. Improper admission of other-acts evidence

{¶ 64} In proposition of law No. IV, Graham argues that the prosecutor introduced other-acts evidence in violation of Evid.R. 404(B) when (1) during his opening statement, he said that Graham was known to carry a weapon and described a picture on Kremling's cell phone as depicting Graham "wielding his two guns," (2) he elicited testimony that Graham was known to carry a gun, and (3) he introduced a photograph of Graham holding two handguns. Graham failed to object to the opening statement or the evidence at trial and thus forfeited all but plain error. *See State v. Payne*, 114 Ohio St.3d 502, 2007-Ohio-4642, 873 N.E.2d 306, ¶ 23.

### 1. Relevant facts

{¶ 65} During his opening statement, the prosecutor said:

> Now, Damantae Graham is known to carry weapons, to have a weapon, and this day [the day of the murder] he has with him his weapon, 380 semi-automatic pistol. And in addition, in the course of planning their robbery at this house on McElrath Street in Ravenna, he provides Marquis Grier * * * with a weapon, also. So we have two guns amongst the three of these robbers. * * *

* * *

[Kent police] get Ty Kremling's cell phone. They find Ty Kremling, download his cell phone. There's pictures of Ty with guess who, Damantae Graham wielding his two guns in the picture.

{¶ 66} During the state's case-in-chief, the prosecutor asked Kremling, "Did you know Damantae to carry a weapon, carry a gun?" Kremling answered, "Yeah, I knew he had one." Kremling also testified that Graham and Grier had been carrying handguns during the robbery. Kremling said he did not know the type of handguns they were carrying but he knew they were not revolvers.

{¶ 67} The state introduced a photo of Graham, Kremling, and another person that had been retrieved from Kremling's cell phone. The photo, state's exhibit No. 18, shows a smiling Graham holding two handguns. Kremling testified that the photo was taken at the McElrath Avenue house "a few days before the incident."

{¶ 68} Grier testified that he and Graham each carried a .380-caliber High Point semiautomatic handgun during the robbery. Grier stated that his handgun had gone missing a week before the incident but that on the day of the robbery, Graham had given it back to him. When asked whether he knew what had happened to Graham's gun, Grier said that a couple days after the murder, Graham told him that he had broken up his gun and thrown it in a wooded area.

{¶ 69} Lewandowski testified that the barrel of the handgun that Graham used to kill Massa was "squared off." He said, "[The gun] was not a revolver. It was a semi-automatic."

{¶ 70} The trial court admitted state's exhibit No. 18, without objection, at the close of the state's case.

2. Analysis

**{¶ 71}** Evid.R. 404(A) is a general prohibition on using evidence of a person's character to prove that he acted "in conformity therewith on a particular occasion." Evid.R. 404(B) provides:

Evidence of other crimes, wrongs or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

**{¶ 72}** In *State v. Williams*, 134 Ohio St.3d 521, 2012-Ohio-5695, 983 N.E.2d 1278, ¶ 20, we set forth a three-part analysis for determining the admissibility of other-acts evidence: to be admissible, (1) the evidence must be relevant, Evid.R. 401, (2) the evidence cannot be presented to prove a person's character to show conduct in conformity therewith but must instead be presented for a legitimate other purpose, Evid.R. 404(B), and (3) the probative value of the evidence cannot be substantially outweighed by the danger of unfair prejudice, Evid.R. 403. The admissibility of other-acts evidence pursuant to Evid.R. 404(B) is a question of law. *State v. Hartman*, ___Ohio St.3d ___, 2020-Ohio-4440, ___N.E.3d___, ¶ 22. The court is precluded from admitting improper character evidence under Evid.R. 404(B), but it has discretion to allow other-acts evidence that is admissible for a permissible purpose. *Hartman* at ¶ 22, citing *Williams* at ¶ 17.

### a. Prosecutor's statement

**{¶ 73}** We first briefly evaluate whether the prosecutor's statement that Graham possessed a gun was improper "evidence." During his opening statement, the prosecutor said, "Damantae Graham is *known to carry weapons*, to have a

weapon, and this day [the day of the murder] he has with him his weapon, 380 semi-automatic pistol." (Emphasis added.)

**{¶ 74}** An attorney's opening statement is an outline of what the attorney expects the evidence to be at trial. *See State v. Clay*, 181 Ohio App.3d 563, 2009-Ohio-1235, 910 N.E.2d 14 (8th Dist.), ¶ 45; *see also Parrish v. Jones*, 138 Ohio St.3d 23, 2013-Ohio-5224, 3 N.E.3d 155, ¶ 22. It is designed to help the jury follow the evidence as it is presented; it is not evidence. *See Clay* at ¶ 45; *Crane v. Sowders*, 889 F.2d 715, 718 (6th Cir.1989) ("The concept that opening statements are not evidence is too elemental to deserve discussion"). The trial court in this case informed the jury as much in its jury instructions. Because the prosecutor's statement that Graham was "known to carry weapons" was not "evidence," Graham's contention that such statement was impermissible under Evid.R. 404(B) lacks merit.

### b. Testimony about gun possession

**{¶ 75}** We next address Kremling's testimony, in response to the prosecutor's questions, that Graham possessed a gun. Under the first part of the *Williams* test, we must determine whether this evidence was relevant. The question is not whether the evidence was relevant to the ultimate question of guilt but whether the evidence was relevant to the particular purpose for which it was offered. *Hartman*, ___Ohio St.3d ___, 2020-Ohio-4440, ___N.E.3d___, at ¶ 26. "[T]he other-acts evidence must be probative of a 'purpose other than the person's character or propensity to behave in a certain way.' " *Id.*, quoting *United States v. Gomez*, 763 F.3d 845, 860 (7th Cir.2014). Testimony that a defendant was seen with a gun—not necessarily the gun involved in the offense—has been held to be admissible when the witness's sighting had "temporal and spatial proximity to the crime in question." *State v. Crosby*, 186 Ohio App.3d 795, 2010-Ohio-1584, 928 N.E.2d 795, ¶ 13 (8th Dist.), citing *State v. Davis*, 8th Dist. Cuyahoga No. 35421, 1977 WL 201136 (Jan. 6, 1977). While questioning Kremling, the prosecutor asked

whether Kremling knew Graham to carry a gun, and Kremling answered that he knew Graham had one.

**{¶ 76}** Assuming that information was relevant, the prosecutor's questioning and Kremling's testimony fail the second part of the *Williams* analysis because it appears the state's purpose was precisely the purpose forbidden by Evid.R. 404(B), as *propensity* evidence. *See Williams*, 134 Ohio St.3d 521, 2012-Ohio-5695, 983 N.E.2d 1278, at ¶ 20; *Hartman* at ¶ 21. Generalized statements and testimony that a defendant is known to carry a gun are generally inadmissible because they are meant to portray the defendant as a violent person who regularly carried guns. *See Crosby* at ¶ 14; *State v. Robinson*, 7th Dist. Jefferson No. 05 JE 8, 2007-Ohio-3501, ¶ 55. Kremling's elicited testimony on this subject was meant to prove Graham's character and that he acted in conformity therewith. *See State v. Tench*, 156 Ohio St.3d 85, 2018-Ohio-5205, 123 N.E.3d 955, ¶ 157.

**{¶ 77}** Moreover, we hold that Kremling's testimony that he knew Graham had a gun also fails the third part of the *Williams* test, because it had little probative value and any value was substantially outweighed by the danger of unfair prejudice.

**{¶ 78}** Thus, Kremling's testimony that he knew Graham to carry a gun was improper.

### c. Photo of Graham holding two guns

**{¶ 79}** We next evaluate the photo of Graham under the *Williams* test. Graham contends that the two handguns in the photo were not connected to the murder. The state never recovered the murder weapon. But the state argues that either gun depicted in the photo could have been the murder weapon. Evidence presented at trial suggests that the handguns in the photo may have been the handguns used in the crimes. Kremling testified that the photo was taken at the McElrath Avenue house "a few days before the incident." As noted above, courts have allowed into evidence testimony that the defendant was seen with a gun—not necessarily the gun involved in the offense—based on the "temporal and spatial

proximity" of the sighting to the crime in question. *Crosby*, 186 Ohio App.3d 453, 2010-Ohio-1584, 928 N.E.2d 795, at ¶ 13.

{¶ 80} Grier also testified that he and Graham each carried a .380-caliber semiautomatic handgun during the crimes. And Lewandowski testified that the gun used to shoot Massa was not a revolver but a semiautomatic gun.

{¶ 81} Graham claims that it requires speculation to conclude that the guns in the photo were the guns used in the crimes, because no evidence connected the guns in the photo to the crimes. But " '[u]ncertainty whether the weapons evidence was actually used in the crime goes to the weight of such evidence, not its admissibility.' " *Commonwealth v. Williams*, 58 A.3d 796, 801 (Pa.Super.2012) (upholding admission of photo of defendant in possession of weapon similar to the one used to commit the charged offenses), quoting *Commonwealth v. Owens*, 929 A.2d 1187, 1191 (Pa.Super.2007).

{¶ 82} Finally, Grier testified that he lost his handgun a week before the robbery but that on the day of the robbery, Graham had given it back to him, which shows that Graham had Grier's handgun before the crimes. This is a further indication that the two handguns Graham is holding in the photo may have been the two handguns used in the crimes.

{¶ 83} Thus, we conclude that the photo had some relevance and satisfies the first part of the *Williams* test.

{¶ 84} Turning to the second part of the *Williams* test, we must determine whether the photo was presented as character evidence, which is impermissible, or whether it was presented for a legitimate purpose. *Williams*, 134 Ohio St.3d 521, 2012-Ohio-5695, 983 N.E.2d 1278, ¶ 20; Evid.R. 404(B). The photo shows a smiling Graham holding two handguns, with one of them pointing toward the camera.

{¶ 85} Graham invokes *State v. Thomas*, 152 Ohio St.3d 15, 2017-Ohio-8011, 92 N.E.3d 821, in arguing that the photo showing him holding the firearms

violated Evid.R. 404(B). In *Thomas*, the victim died from a stab wound to the neck. Without objection, the state introduced five knives that were seized from the defendant's residence but were unrelated to the murder. The prosecutor described them to the jury as " 'full Rambo combat knives.' " *Id*. at ¶ 48. This court held that the admission of the knives violated Evid.R. 404(B) and amounted to plain error because the state *knew* that the knives were not used in connection with the murder. *Id*. at ¶ 45, 49. This court added, "It is apparent that the state offered this evidence to portray Thomas as a person of violent character who had acted in conformity with his propensity to kill—a use of evidence prohibited by Evid.R. 404(B) * * *." *Id*. at ¶ 48.

{¶ 86} Graham argues that the admission of the photo showing him holding and posing with the guns was similar to the admission of the knives in *Thomas* because the guns in the picture were not connected to the murder. But unlike in *Thomas*, in this case, the state sought to prove that the handguns in the photo were the same handguns used during the robbery and murder. Thus, Graham's reliance on *Thomas* is misplaced.

{¶ 87} The state argues that the photo of Graham holding the two guns was admissible to prove the identity of the shooter, because Graham told investigators, "I wasn't there," which placed the identity of the shooter in dispute.

{¶ 88} Other acts can be evidence of identity in two situations. *State v. Lowe*, 69 Ohio St.3d 527, 531, 634 N.E.2d 616 (1994). "First are those situations where other acts 'form part of the immediate background of the alleged act which forms the foundation of the crime charged in the indictment,' and which are 'inextricably related to the alleged criminal act.' " *Id*. at 531, quoting *State v. Curry*, 43 Ohio St.2d 66, 73, 330 N.E.2d 720 (1975). "Other acts may also prove identity by establishing a *modus operandi* applicable to the crime with which a defendant is charged. 'Other acts forming a unique identifiable plan of criminal activity are admissible to establish identity under Evid.R. 404(B).' " *Lowe* at 531,

quoting *State v. Jamison*, 49 Ohio St.3d 182, 552 N.E.2d 180 (1990), syllabus. " 'Modus operandi' literally means method of working." *Hartman*, ___Ohio St.3d ___, 2020-Ohio-4440, ___N.E.3d___, at ¶ 37. "It is evidence of a signature, fingerprint-like characteristics unique enough 'to show that the crimes were committed by the same person.' " *Id.*, quoting Weissenberger, *Federal Evidence*, Section 404.17 (7th Ed.2019).

{¶ 89} Here, the photo was not admissible to prove identity. It did not show that Graham was at the apartment at the time of the crimes or directly tie him to those crimes. The photo also fails to establish modus operandi because it provides no "behavioral fingerprint" associated with the crimes in question. *See Lowe* at 531; *Hartman* at ¶ 38. Thus, the state's theory for the admissibility of the photo lacks merit.

{¶ 90} Therefore, even though the photo may have had some relevance, it was introduced to suggest that Graham has a propensity for gun violence and to imply that he acted in conformity with that character on the day of the crimes at issue. We hold that the photo fails the second part of the *Williams* test.

{¶ 91} Finally, we also conclude that the photo fails the third part of the *Williams* test, because the probative value of the photo was substantially outweighed by the danger of unfair prejudice. The photo was probative because it showed handguns that might have been used in the crimes. On the other hand, the photo, which shows a smiling Graham pointing a handgun at the camera, was highly prejudicial. The trial court also provided no limiting instructions that this evidence was not being offered to prove Graham's character. *Compare Williams*, 134 Ohio St.3d 521, 2012-Ohio-5695, 983 N.E.2d 1278, at ¶ 24 (limiting instructions lessened the prejudicial effect of other-acts testimony). Thus, we conclude that the photo fails to satisfy the third part of the *Williams* test.

{¶ 92} Therefore, we hold that the photo was improperly admitted.

### 3. No plain error

{¶ 93} As discussed earlier, to establish plain error, Graham must show that an error occurred, that the error was plain, and that the error affected the outcome of the trial. *Barnes*, 94 Ohio St.3d at 27, 759 N.E.2d 1240. Graham cannot meet his burden to prove that the prosecutor's statement, Kremling's testimony, or the introduction of the photo prejudiced him by affecting the outcome of the trial, in light of the remaining evidence of Graham's guilt. Such evidence included Lewandowski's eyewitness testimony describing the shooter, a description that matched Graham, and Grier's and Kremling's testimony that Graham admitted that he had shot Massa during the robbery. Thus, no plain error occurred.

{¶ 94} Based on the foregoing, we reject proposition of law No. IV.

### E. Prosecutor bolstered witness credibility

{¶ 95} In proposition of law No. III, Graham argues that the prosecutor improperly bolstered the credibility of two of his codefendants, Kremling and Grier. However, defense counsel failed to object at trial and therefore Graham has forfeited all but plain error. *See Payne*, 114 Ohio St.3d 502, 2007-Ohio-4642, 873 N.E.2d 306, at ¶ 23. Graham also argues that defense counsel were ineffective by failing to object to the prosecutor's bolstering during his opening statement, his closing rebuttal argument, and his questioning of the codefendants.

{¶ 96} First, Graham argues that the prosecutor improperly vouched for the testimonies of Kremling and Grier during his opening statement. It is improper for a prosecutor to vouch for the credibility of a witness at trial. Vouching occurs when the prosecutor implies knowledge of facts outside the record or places his or her personal credibility in issue. *See, e.g.*, *State v. Myers*, 154 Ohio St.3d 405, 2018-Ohio-1903, 114 N.E.3d 1138, ¶ 145; *Davis*, 116 Ohio St.3d 404, 2008-Ohio-2, 880 N.E.2d 31, at ¶ 232. A prosecutor also may not express his or her personal belief or opinion as to the credibility of a witness. *State v. Williams*, 79 Ohio St.3d 1, 12, 679 N.E.2d 646 (1997).

{¶ 97} During his opening statement, the prosecutor stated that Kremling and Grier lied to the police about the robbery and murder after they were first arrested. The prosecutor added that they were "eventually prevailed upon by their parents, their girlfriends and, eventually, their attorneys to tell the truth, come clean. And they agree[d] to cooperate and give truthful statements." No vouching occurred. The prosecutor neither implied knowledge of out-of-court information nor placed the prosecutor's own credibility in issue. The prosecutor merely discussed the circumstances leading to Kremling's and Grier's eventual decision to cooperate with police, and the testimony at trial supported his statements. *See State v. Cody*, 8th Dist. Cuyahoga No. 77427, 2002-Ohio-7055, ¶ 35. No error occurred.

{¶ 98} Second, Graham argues that the prosecutor improperly vouched for Kremling and Grier during his closing rebuttal argument. During rebuttal, the prosecutor addressed defense counsel's closing-statement attack on Kremling's and Grier's credibility. The prosecutor stated:

Three young men took that stand and implicated themselves in aggravated murder; testified under oath that they committed aggravated murder. The testimony they gave on that witness stand is admissible against them at their own trials. * * *

* * *

What does matter here though is that they tell the truth because nobody is gonna talk to them or their attorneys if they're lying or not being truthful and they know that.

* * * Every action that Marquis [Grier] and Ty [Kremling] and Graham took inside that apartment was corroborated by the two occupants of the apartment. Every one consistent down to the last detail. * * *

28

And you heard them testify the co-defendants themselves have been separated for the past eight months. They've been isolated from each other for the last eight months for that very reason.

The version is the same, identical because it's the truth. You all know that when you make up a story and you lie it's different every time you tell it. You can't keep it straight. That's how you catch people in lies. * * * If they're lying something is gonna change. But the truth is the truth is the truth. It always stays the same. And that's what you heard from the witness stand.

{¶ 99} None of these comments were improper. They neither implied knowledge of out-of-court information nor placed the prosecutor's own credibility in issue. Each comment dealt with matters that the jury could properly consider in evaluating Kremling's and Grier's credibility: Kremling and Grier each admitted unfavorable facts about their participation in the crimes, they had been separated from each other for the past eight months and yet their testimonies were consistent, the details given in their testimonies were corroborated by the victims' testimonies, and they were motivated to tell the truth. *See Myers*, 154 Ohio St.3d 405, 2018-Ohio-1903, 114 N.E.3d 1138, at ¶ 147. "This type of argument is not improper vouching when, as here, the prosecutor is responding to defense counsel's attacks on a witness's credibility and refers to facts in evidence that tend to make the witness more credible." *State v. Jackson*, 107 Ohio St.3d 53, 2005-Ohio-5981, 836 N.E.2d 1173, ¶ 120. No error occurred.

{¶ 100} Finally, Graham argues that the prosecutor improperly bolstered the credibility of Kremling and Grier by asking them about the truthfulness of their testimony. Kremling testified that he initially lied to the police about the crimes. He explained that he later told the truth: "[W]e all got caught, um, and I came to

talk to you [the prosecutor]. That's when I first told the truth." The prosecutor then asked, "Are you telling the truth today?" Kremling responded, "Yes, I am." Similarly, Grier testified that he initially lied to the police but that he decided to tell the truth after talking to his father, his girlfriend, and his lawyer. The prosecutor then asked, "Are you telling the truth today?" Grier answered, "Yes."

{¶ 101} "Both at common law and under the Federal Rules, the general norm is that the witness's proponent may not bolster the witness's credibility before any attempted impeachment." 1 McCormick, *Evidence*, Section 33, at 250 (8th Ed.2020). Similarly to Fed.R.Evid. 608(a), Ohio Evid.R. 608(A) provides that "evidence of truthful character is admissible only after the character of the witness for truthfulness has been attacked by opinion or reputation or otherwise." Here, the prosecutor asked the witnesses, "Are you telling the truth today?" before their credibility had been attacked on cross-examination. Although that question should not have been asked, we conclude that the prosecutor did not give either Kremling or Grier more credibility in asking it, because both witnesses swore to tell the truth before they testified. *See State v. Howard*, 2d Dist. Montgomery No. 20575, 2005-Ohio-3702, ¶ 46. Thus, no plain error occurred.

{¶ 102} As for his ineffective-assistance-of-counsel claims, Graham fails to show that he was prejudiced by any of the alleged failures by defense counsel, particularly given the overwhelming evidence of his guilt.

{¶ 103} Based on the foregoing, we reject proposition of law No. III.

### F. Improper admission of victim-impact evidence

{¶ 104} In proposition of law No. VI, Graham argues that the trial court erred by admitting victim-impact testimony during the guilt phase of the trial. We agree, but we conclude that Graham was not prejudiced by the admission of this victim-impact evidence.

### 1. Joe Massa's testimony

{¶ 105} During the guilt-phase proceedings, over the defense's objection, Joe Massa ("Mr. Massa"), the victim's father, testified about his son's life, expressing great pride in his son's achievements, acknowledging the future plans and dreams that his son had and that he had for his son, conveying to the jury the immense amount of love and admiration he had for his son, and identifying some of the ways in which his life has changed as a result of his son's death and some of the difficulties that a life without him will bring. The testimony spanned 10 pages of the guilt-phase transcript, with the state asking Mr. Massa approximately 20 questions regarding his son.

{¶ 106} Mr. Massa testified that Nick was the third oldest of his four children. He stated, "Nick was the ideal son; fun, very curious, so I had the full-time job teaching Nick 'cause he was constantly full of questions, constantly wanting to learn, um, kept me very busy, very busy." Mr. Massa said, "[Nick] really got into woodworking at an early age with my—my father-in-law. Nick was definitely a mama's boy 'til he got older and then he started to become a daddy's boy." Mr. Massa expressed that Nick loved building things, and he reminisced about how he and Nick had built a bench in the garage, and said that Nick had gotten "some new tools because he had some things that he wanted to build this summer."

{¶ 107} When asked about Nick's education, Mr. Massa stated that his son had gone to Westlake High School and that he had been interested in science and then had become more interested in business. Mr. Massa said that he had been surprised at Nick's interest in business and then stated, "I think he started to grasp a little bit more of what I was doing * * * 'cause I'm in business. * * * [And] he became more and more of wanting to be successful and making us proud to the point where * * * he pretty much vowed that he would have a great job and buy us a home in Florida." When asked whether his son had had any jobs, Mr. Massa said,

"Nick delivered papers at a very early age," and Mr. Massa listed several other jobs Nick had held over the years, noting that one reason Nick worked was to help him pay for the family's fish tank.

{¶ 108} The prosecutor inquired about the fish tank. Mr. Massa then described his son's passion for caring for the fish in the fish tank in the family living room and his influence in replacing the family's small fish tank with a 55-gallon salt-water fish tank. Mr. Massa began by explaining that Nick "kept bugging" him and eventually convinced him to get a larger fish tank. Mr. Massa informed the jury that Nick took care of that tank and then "started pushing" him to get a salt-water tank. Mr. Massa testified that he had owned a salt-water fish tank as a child, so he knew that "there was a lot to it" and he was really "not up to doing it," but Nick had talked him into it. Then Mr. Massa explained the complex salt-water-tank system that Nick had installed and described it as "unbelievable." While explaining the complexities of the system, Mr. Massa said, "I can't even—I'm learning," and he stated, "Nick has left me with a lot with this fish tank. I'm having to learn on my own, but I'm getting there."

{¶ 109} The prosecutor then asked Mr. Massa why Nick had decided to attend Kent State University and what he had been studying there. Mr. Massa informed the jury that his son had been studying business at the university. Mr. Massa said, "I attended Kent in 1979. I didn't make it through graduation. I think Nick wanted to do what I couldn't. In fact, we know he did." Mr. Massa added, "And we were both getting * * * set for him to be able to help me with my business * * *. * * * I was really looking forward to Nick being able to give me some advice on what he's learning in today's business, possibly working with me a little bit this year so he can learn my side, helping each other out there."

{¶ 110} According to Mr. Massa, on the day before his son's death, his wife told him that their son had sent her a text indicating that he was having a "miserable day." Mr. Massa explained to the jury, "Nick had just gotten his first real girlfriend

and I think I said something like he's probably having some love problems, which I was having a hard time with knowing that I was having to share Nick with somebody else." Not long after his wife told him that information, Mr. Massa saw a car pull up and his son came "running up the drive all happy." Mr. Massa testified that his son had brought Haithcock and Lewandowski to the house, introduced them, and showed them around. Mr. Massa commented, "And I remember standing at the door looking—so proud of him that he picked up new friends so quickly. Because his roommate, who was one of his best friends, had left after the first quarter, so Nick was very alone and he already picked up what he thought were new friends. And just watching Nick be the leader that I knew he was and was gonna be."

{¶ 111} Mr. Massa stated that when Nick was preparing to leave with his friends, Nick indicated that he would come home the following weekend. Mr. Massa told Nick before he left, "Nick, you have no idea how proud I am of you and how much I love you." Mr. Massa continued, "And he hugged me and said I love you, too, dad. And that's the last time I got to talk to him. He—he was my best friend."

{¶ 112} The state then had Mr. Massa identify Nick's photograph. Mr. Massa stated, "This is my son Nick and I know he's with me right now." Following Mr. Massa's testimony, the state introduced Nick's photograph into evidence.

2. Analysis

{¶ 113} Victim-impact evidence includes evidence relating to the victim's personal characteristics and the impact that the crimes had on the victim's family. *State v. McKelton*, 148 Ohio St.3d 261, 2016-Ohio-5735, 70 N.E.3d 508, ¶ 259; *Payne v. Tennessee*, 501 U.S. 808, 817, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991). The admission of such evidence is limited to the sentencing phase of the death-penalty proceedings. *See* R.C. 2930.13, 2930.14(A), and 2947.051; Article I, Section 10(a)(A)(3), Ohio Constitution. We have "permitted victim-impact

testimony *in limited situations* in capital cases when the testimony is *not* overly emotional *or* directed to the penalty to be imposed." (Emphasis added.) *State v. Wilks*, 154 Ohio St.3d 359, 2018-Ohio-1562, 114 N.E.3d 1092, ¶ 79. And we have upheld the admission of this testimony at the guilt phase of the trial only when the evidence was relevant to the facts attendant to the offense. *State v. Fautenberry*, 72 Ohio St.3d 435, 440, 650 N.E.2d 878 (1995); *see McKelton* at ¶ 259; Evid.R. 402 (evidence that is not relevant is not admissible).

### a. Mr. Massa's testimony was irrelevant

{¶ 114} Graham argues that Mr. Massa's testimony had nothing to do with the facts of the case and was presented solely to prejudice the jury. The state argues that Mr. Massa's testimony was used to prove that Nick was a living person and was permissible because the testimony was not overly emotional and did not address the penalty.

{¶ 115} To be admissible at trial, evidence must be relevant. Evid.R. 402. The state cites *State v. Noling*, 98 Ohio St.3d 44, 2002-Ohio-7044, 781 N.E.2d 88, ¶ 56, in arguing that Mr. Massa's testimony was admissible to prove that Nick had been a living person, which is an element of an aggravated-murder charge. The state further argues that Nick's pre-death photograph was admissible for purposes of identifying the victim, *see State v. LaMar*, 95 Ohio St.3d 181, 2002-Ohio-2128, 767 N.E.2d 166, ¶ 57, and that Mr. Massa identified the photograph of his son during his testimony.

{¶ 116} In *Noling*, we upheld the admission of a neighbor's testimony that the victims had been gregarious and meticulous, but we noted that the neighbor's testimony helped explain why the neighbor had gone to check on the victims and also helped to establish a time of death. *Noling* at ¶ 56. And we upheld the admission of a relative's testimony that had "simply established that the [victims] had been living persons." *Id*. at ¶ 55-56. The limited testimony presented in *Noling* is in sharp contrast to Mr. Massa's detailed testimony about his son. While Mr.

Massa identified his son's photograph, the remainder of his testimony went beyond what was necessary to prove that his son had been a living person. Thus, we reject this rationale for permitting significant portions of Mr. Massa's testimony.

{¶ 117} At a sidebar discussion during the trial, the prosecutor also argued that Mr. Massa's testimony was admissible as long as it did not "touch on recommendations to the Court as to penalty or sentencing." It is true that Mr. Massa did not mention penalties during his testimony. However, the fact that Mr. Massa's testimony was not directed to the penalty to be imposed does not mean that the prosecutor could elicit testimony about Nick's life and the impact his death has had upon his father, especially when that testimony provided the jury with no relevant facts attendant to the offense and the jury had already received evidence that Nick had been a living person from Haithcock's and Lewandowski's testimony.

{¶ 118} The state also relies on *State v. Maxwell*, 139 Ohio St.3d 12, 2014-Ohio-1019, 9 N.E.3d 930, in arguing that Mr. Massa's testimony was admissible. In *Maxwell*, we upheld the admission of testimony about the victim's family and her divorce during the guilt phase of trial, because such testimony provided background information about the victim's relationship with the defendant and the witnesses who testified. *Id.* at ¶ 134-137. *Maxwell* is not instructive here, because Mr. Massa's testimony did not provide relevant background regarding the circumstances of Nick's death.

{¶ 119} The state elicited victim-impact testimony from a justifiably grieving father during the guilt phase of the trial, and much of that testimony had nothing to do with the crime. *See State v. McKnight,* 107 Ohio St.3d 101, 2005-Ohio-6046, 837 N.E.2d 315, ¶ 99 (father's statement that "his daughter's disappearance was 'like somebody hit [him] in the stomach with a sledgehammer' was of questionable relevance"). This testimony was irrelevant and should not have been admitted at trial.

### b. Mr. Massa's testimony did not prejudice Graham

{¶ 120} Having concluded that the trial court erred in admitting Mr. Massa's testimony, we must determine whether the testimony resulted in reversible error. To determine whether an error affected the substantial rights of the defendant and requires a new trial, we must ascertain "(1) whether the defendant was prejudiced by the error, i.e., whether the error had an impact on the verdict, (2) whether the error was not harmless beyond a reasonable doubt, and (3) whether, after the prejudicial evidence is excised, the remaining evidence establishes the defendant's guilt beyond a reasonable doubt." *State v. Arnold*, 147 Ohio St.3d 138, 2016-Ohio-1595, 62 N.E.3d 153, ¶ 50 (lead opinion), citing *State v. Harris*, 142 Ohio St.3d 211, 2015-Ohio-166, 28 N.E.3d 1256, ¶ 37 (setting forth the three-part analysis for determining whether the error affected the substantial rights of the defendant and thus requires a new trial).

#### i. The standard for determining whether testimony is overly emotional

{¶ 121} For purposes of analyzing whether the admission of Mr. Massa's testimony constituted reversible error in this case, we focus on whether the testimony was overly emotional.

{¶ 122} The victim-impact testimony that we have upheld as admissible or deemed not prejudicial in other cases was not overly emotional. *See State v. Reynolds,* 80 Ohio St.3d 670, 679, 687 N.E.2d 1358 (1998); *State v. Lang*, 129 Ohio St.3d 512, 2011-Ohio-4215, 954 N.E.2d 596, ¶ 237. The "overly emotional" standard is derived from this court's decision in *Reynolds*. *See Reynolds* at 679.

{¶ 123} Testimony is overly emotional when it is likely to inflame the passions of the jurors and elicit a purely emotional response that would inhibit the jurors from making an objective and rational determination regarding the defendant's guilt and/or the appropriate punishment. *See People v. Simon,* 1 Cal.5th 98, 138, 375 P.3d 1, 204 Cal.Rptr.3d 380 (2016) (emotional testimony is permissible if it is relevant and is not inflammatory rhetoric that elicits purely

36

emotional or irrational responses from the jurors); *see also People v. Weaver*, 53 Cal.4th 1056, 1082, 273 P.3d 546, 139 Cal.Rptr.3d 355 (2012) ("testimony was emotionally wrenching, [but] it was not so extreme as to divert the experienced trial judge's attention from his proper role," and the judge stated that it did not cause him to " 'react with a rash or purely subjective response' "); *State v. Bernard*, 608 So.2d 966, 970-972 (La.1992) (when determining whether testimony was overly emotional, a court analyzes whether the testimony inserted arbitrary factors that likely influenced the jurors' decisions).

{¶ 124} This court has yet to adopt or set a standard in determining whether the admission of victim-impact testimony resulted in error. In making this determination in the past, we have generally simply described the testimony and then stated whether or not the testimony was overly emotional and/or resulted in error. *See, e.g.*, *Reynolds* at 678-679; *State v. McNeill,* 83 Ohio St.3d 438, 446-447, 700 N.E.2d 596 (1998); *State v. Hartman,* 93 Ohio St.3d 274, 292, 754 N.E.2d 1150 (2001); *State v. McKnight*, 107 Ohio St.3d 101, 2005-Ohio-6046, 837 N.E.2d 315, ¶ 91-99; *Lang* at ¶ 235-238; *State v. Maxwell*, 139 Ohio St.3d 12, 2014-Ohio-1019, 9 N.E.3d 930, ¶ 136-137; *State v. Dean,* 146 Ohio St.3d 106, 2015-Ohio-4347, 54 N.E.3d 80, ¶ 239-241; *State v. Obermiller*, 147 Ohio St.3d 175, 2016-Ohio-1594, 63 N.E.3d 93, ¶ 103-104.

{¶ 125} In fact, it would not be prudent for us to establish a rigid set of factors to employ in evaluating this testimony, given the variables present in each case. This is apparent from our review of our precedent and that of our sister courts across the country. *See, e.g.*, *Malone v. State,* 2007 OK CR 34, 168 P.3d 185, ¶ 62 (whether testimony is too emotional is a subjective determination); *Salazar v. State*, 90 S.W.3d 330, 336 (Tex.Crim.App.2002), quoting *Mosley v. State,* 983 S.W.2d 249, 262 (Tex.Crim.App.1998) ("there is no 'bright and easy line' for deciding precisely what evidence is and is not admissible as either victim character or victim impact evidence"). Nevertheless, we believe it may be helpful to trial courts and

parties if we set forth a nonexhaustive list of factors that may be used in making this determination, with the understanding that these factors may not be applicable in every case and that in other cases, other relevant factors may be identified and applied.

{¶ 126} We find the following factors relevant to making the determination in this case: (1) the length of the victim-impact testimony, *see Lang*, 129 Ohio St.3d 512, 2011-Ohio-4215, 954 N.E.2d 596, at ¶ 238 (witnesses *briefly* summarized the victims' lives); *Lambert v. State*, 675 N.E.2d 1060, 1065 (Ind.1996) (victim-impact testimony that spanned 29 transcript pages was not brief and the error in admitting it was not harmless); *State v. Taylor*, 669 So.2d 364, 371 (La.1996) (victim-impact testimony took up only 10 pages of a 793-page penalty-phase transcript, and any possible prejudicial effect was diluted by the defendant's presentation of a lengthy and detailed mitigation case); *Malone* at ¶ 60-61 (victim-impact testimony that took up 36 pages of the transcript, 28 pages of which was uninterrupted, detailed narrative, went well beyond the limitations for appropriate victim-impact evidence); (2) whether witnesses, jurors, and audience members showed physical signs of emotion during the testimony, *see Reynolds,* 80 Ohio St.3d at 678-679, 687 N.E.2d 1358 (court noted that witness became distraught when asked about the effect his mother's death had on him, but it found that the victim-impact statement was not overly emotional); *State v. Glassel*, 211 Ariz. 33, 54, 116 P.3d 1193 (2005) (although victim-impact testimony was emotional and caused the witnesses and jurors to cry, it was not unduly prejudicial, because senseless murders create strong emotional responses); *Lawler v. State*, 276 Ga. 229, 232, 576 S.E.2d 841 (2003) (record showed that witnesses and jurors became emotional during victim-impact evidence but there were no outbursts or displays of emotion that would have unduly prejudiced the defendant); (3) the detail and depth of the victim-impact testimony with regard to the murder victim, *see Salazar* at 336 (the case law allowing states to put on evidence providing a glimpse into the victim's life and background is not

an invitation to give a replay of the victim's life); *Malone* at ¶ 60 (victim-impact statements were never meant to be eulogies); (4) whether the victim-impact witness used emotionally charged language, *State v. Rose*, 231 Ariz. 500, 513, 297 P.3d 906 (2013) (court noted that it did not condone the vengeful language used by the victim-impact witness or her reference to the defendant as a "cop killer"); *Conover v. State,* 1997 OK CR 6, 933 P.2d 904, 920 (statements that the victim was "butchered like an animal" and that the defendant "butchered him" have no place in a victim-impact statement), *abrogated on other grounds*, *Bosse v. Oklahoma,* __ U.S. __, 137 S.Ct. 1, 196 L.Ed.2d 1 (2016); (5) the number of victim-impact witnesses, *see Lawler* at 232 (five victim-impact witnesses testified, but because each witness's testimony was brief, the trial court did not abuse its discretion in allowing the testimony); and (6) our precedent in similar cases involving allegedly overly emotional victim-impact testimony, *see Wilks* at ¶ 79; *see also People v. Verdugo,* 50 Cal.4th 263, 298, 236 P.3d 1035, 113 Cal.Rptr.3d 803 (2010) (in determining whether victim-impact testimony was admissible, the California Supreme Court compared the testimony to victim-impact testimony that it had found admissible in the past). Clearly, this list is not exhaustive, and it also should not be treated as a checklist. We list these factors merely as matters to be considered.

### ii. Mr. Massa's testimony was not overly emotional

{¶ 127} Applying the analysis articulated above to the facts of this case, we conclude that Mr. Massa's testimony was not overly emotional; however, we acknowledge that this is a close call.

{¶ 128} In this case, Mr. Massa's testimony takes up 10 pages of the guilt-phase transcript (which, excluding voir dire, covers 562 pages), and those 10 pages include 20 or so questions asked by the prosecutor and three instances of uninterrupted narrative by Mr. Massa. The length of this testimony is not overwhelming in comparison to the length of testimony permitted by our sister

courts. *See, e.g.*, *People v. Dykes*, 46 Cal.4th 731, 782, 209 P.3d 1, 95 Cal.Rptr.3d 78 (2009) (victim-impact testimony was not too lengthy when one witness's testimony covered 5 pages of transcript, a second covered 9 pages of transcript, and the third covered 18 pages of transcript); *Taylor*, 669 So.2d at 371 (victim-impact testimony took up only 10 pages of a 793-page penalty-phase transcript, and any possible prejudicial effect was diluted by the defendant's presentation of a lengthy and detailed mitigation case); *State v. Washington*, 355 Or. 612, 658, 330 P.3d 596 (2014) (witness testimony that covered 23 pages of a 2,000-page guilt-phase transcript and that contained minimal victim-impact evidence was harmless). However, the length of Mr. Massa's victim-impact testimony is not insignificant, given that the testimony was irrelevant and therefore inadmissible during the guilt phase of the proceedings.

{¶ 129} The record does not indicate that there were any physical manifestations of emotion by Mr. Massa, the jury, or members of the audience. But the testimony presented a detailed description of Nick, which was elicited by the state from his grieving father. Mr. Massa discussed his son's life at length—his accomplishments and future aspirations—and not only conveyed to the jury his sincere love for and admiration of his son, whom he called his "best friend," but also identified the effect that his son's death had on some of his own home responsibilities. Mr. Massa recounted for the jury the last words that he spoke to his son and the last words his son spoke to him. And he further informed the jury, when identifying Nick's photograph, "This is my son Nick and I know he's with me right now." While Mr. Massa was the only victim-impact witness to testify during the trial, it is hard to imagine that it was not impactful—the jury was left with a loving father's last memory of his only son prior to the state's resting its case.

{¶ 130} Mr. Massa's impactful testimony is not unlike some of the other victim-impact testimony that we have permitted in previous cases. In *Reynolds*, 80

Ohio St.3d 670, 687 N.E.2d 1358, the victim's son testified that his mother was from a large family, that her house had been the gathering place for the family, and that she was a special part of their lives. *Id.* at 678. The son also became distraught when trying to speak about the impact that his mother's death had upon him, eventually stating that his mother had been looking forward to his daughter's wedding and that his other daughter had lived with her for a brief period of time and noting that his daughters missed their grandmother very much. *Id.* Reviewing for plain error, this court determined that the victim-impact testimony was not overly emotional or directed to the penalty to be imposed, and this court stated that it could not say that the sentence would have been otherwise but for the victim-impact evidence. *Id.* at 679.

{¶ 131} And in *Hartman*, 93 Ohio St.3d 274, 754 N.E.2d 1150, the victim's mother had briefly discussed the victim's early life, her schooling, and her close-knit family, and she had summed up the impact of her daughter's death on the family by stating, "[I]t's been around nine months now since our daughter Winda was brutally murdered. It has been an extremely bad time for us and will be from now on. She'll never leave our heart." *Id.* at 292. This court determined that the victim-impact testimony in *Hartman* was not "overly emotional." *Id.*

{¶ 132} The most recent death-penalty case in which we discussed victim-impact testimony is *Wilks,* 154 Ohio St.3d 359, 2018-Ohio-1562, 114 N.E.3d 1092. In that case, the victim's older sister presented victim-impact evidence during her direct examination. *Id.* at ¶ 78. She testified that the victim loved her nieces and nephews and she had a close relationship with her siblings. *Id.* She said: "[The victim] had a beautiful heart, and she was smart, caring, funny. She loved to make people laugh. And whenever she was anywhere, like she commanded attention. When she was present, you knew she was in the room. It's just like she had this personality where like people just gravitated to her * * *." (Ellipsis sic.) *Id.* We

determined that the brief testimony was not overly emotional and that no plain error occurred in admitting the testimony. *Id.* at ¶ 80.

{¶ 133} Here, the state elicited from Mr. Massa a detailed description of Nick's life, how much Nick was loved and admired by his father, and the additional responsibilities placed on Mr. Massa as a result of Nick's death. This testimony is impactful and leaves a lasting memory of the uniqueness of Nick Massa, but we cannot say that it inflamed the passions of the jurors, eliciting a purely emotional response that inhibited the jurors from making objective and rational decisions regarding Graham's guilt or the appropriate punishment. Therefore, we conclude that it was not overly emotional.

*iii. Graham was not prejudiced by the erroneous admission of Mr. Massa's victim-impact testimony*

{¶ 134} As noted above, Mr. Massa's testimony was irrelevant but not overly emotional. We conclude that Graham was not prejudiced in the guilt phase of the trial by the trial court's error in admitting this testimony, because, even assuming that the error was not harmless, when that improper testimony is excised, the remaining evidence properly admitted at trial established Graham's guilt beyond a reasonable doubt. *See Arnold*, 147 Ohio St.3d 138, 2016-Ohio-1595, 62 N.E. 3d 153, at ¶ 51. Most important, Lewandowski observed the shooter and provided a description that matched Graham, as compared to his codefendants, and Grier and Kremling testified that Graham had admitted that he shot Nick.

{¶ 135} We also hold that this guilt-phase testimony did not prejudice Graham in the mitigation phase, because although Mr. Massa's testimony was impactful, it was not overly emotional. Moreover, the trial court instructed the jury not to be influenced "by any consideration of sympathy or prejudice" and to make its findings "without bias, sympathy or prejudice." We presume the jury followed the trial court's instructions. *See State v. Treesh*, 90 Ohio St.3d 460, 480, 739 N.E.2d 749 (2001).

{¶ 136} But it is essential that we emphasize that the proper time for victim-impact evidence is at sentencing. *See* R.C. 2930.13, 2930.14(A), and 2947.051; Ohio Constitution, Article I, Section 10a(A)(3); *State v. White*, 85 Ohio St.3d 433, 445, 709 N.E.2d 140 (1999) (the "statutory scheme is silent as to how victim-impact evidence may be presented to *juries* in capital cases," and thus, the General Assembly has yet to expand victim-impact evidence in capital cases to the extent allowed in *Payne v. Tennessee,* 501 U.S. 808, 111 S.Ct. 2597, 115 L.Ed.2d 720 [emphasis sic]). Victim-impact testimony is admissible during the guilt phase of the proceedings only when it is *relevant* to the commission of the offense *and* it is not overly emotional. When such evidence is improperly admitted in the guilt phase of the proceedings, it increases the likelihood that arbitrary factors will influence the jury's decisions, which increases the possibility that a reversal will be required. *See Bernard,* 608 So.2d at 972; *Lang*, 129 Ohio St.3d 512, 2011-Ohio-4215, 954 N.E.2d 596, at ¶ 237 ("This court has permitted victim-impact testimony in limited situations in capital cases when the testimony is not overly emotional or directed to the penalty to be imposed"). Although it is clear that the trial court erred in admitting Mr. Massa's testimony in this case, we conclude that the admission of the testimony did not constitute reversible error.

{¶ 137} Based on the foregoing, we reject proposition of law No. VI.

### G. Failure to present mitigating evidence

{¶ 138} In proposition of law No. VII, Graham asserts that defense counsel were ineffective by failing to adequately prepare and present mitigating evidence. He specifies three alleged inadequacies: counsel (1) presented only one expert witness, (2) failed to call any family members during mitigation, and (3) failed to properly assist him in preparing for his unsworn statement.

{¶ 139} "The defense decision to call or not call a mitigation witness is a matter of trial strategy. * * * Debatable trial tactics generally do not constitute ineffective assistance of counsel." *State v. Elmore*, 111 Ohio St.3d 515, 2006-Ohio-

6207, 857 N.E.2d 547, ¶ 116. Counsel in a capital case have an "obligation to conduct a thorough investigation of the defendant's background" to determine the availability of mitigating evidence. *Williams v. Taylor*, 529 U.S. 362, 396, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000). But " 'strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable.' " *Wiggins v. Smith*, 539 U.S. 510, 521, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003), quoting *Strickland*, 466 U.S. at 690, 104 S.Ct. 2052, 80 L.Ed.2d 674.

{¶ 140} As an initial matter, nothing in the record shows that defense counsel did not conduct an adequate investigation. Counsel hired a psychologist and a mitigation specialist. Billing records show that James Crates, the mitigation specialist, spent numerous hours conducting his investigation between May 6 and November 8, 2016. Billing records also show that Dr. Thomas Swales, the psychologist hired by the defense, spent several hours testing and evaluating Graham between May 11 and November 9, 2016. Although the record does not show the full extent of defense counsel's investigation into mitigation, "we cannot infer a defense failure to investigate from a silent record," *State v. Were*, 118 Ohio St.3d 448, 2008-Ohio-2762, 890 N.E.2d 263, ¶ 244.

{¶ 141} First, Graham argues that counsel should have called more than one expert witness. During mitigation, Dr. Swales testified about Graham's difficult childhood, his family's history of mental illness and domestic violence, his marijuana dependence and Xanax addiction, and his ability to adjust to prison life. Dr. Swales also conducted testing of Graham, which showed that he has an IQ of 99. He testified that Graham's youthfulness, his association with the "wrong crowd," and his lack of maturity were mitigating factors the jury should consider.

{¶ 142} "The decision to forgo the presentation of additional mitigating evidence does not itself constitute proof of ineffective assistance of counsel." *State v. Keith*, 79 Ohio St.3d 514, 536, 684 N.E.2d 47 (1997). " 'Attorneys need not

pursue every conceivable avenue; they are entitled to be selective.' " *State v. Murphy*, 91 Ohio St.3d 516, 542, 747 N.E.2d 765 (2001), quoting *United States v. Davenport*, 986 F.2d 1047, 1049 (7th Cir.1993). Dr. Swales provided comprehensive testimony about mitigating factors the jury should consider. Moreover, Graham fails to identify other experts that defense counsel should have called. This claim rests on mere speculation and is insufficient to establish ineffective assistance. *See State v. Short*, 129 Ohio St.3d 360, 2011-Ohio-3641, 952 N.E.2d 1121, ¶ 119.

{¶ 143} Second, Graham argues that defense counsel were ineffective by failing to call any of Graham's family members during mitigation. Graham asserts that his grandmother, mother, and/or sister should have been called as mitigation witnesses.

{¶ 144} Dr. Swales testified that he had talked with Graham's grandmother, mother, and sister and learned "what his life was like." He described Graham's chaotic childhood, his mother's use of a belt to discipline Graham, and the family's history of mental illness, domestic violence, and drug abuse. Dr. Swales noted that in the year before the murder, Graham's grandmother was convicted of domestic violence, following a confrontation with Graham's mother and sister. Dr. Swales added, "[E]ven though Damantae wasn't there, wasn't the victim of domestic violence, it just shows you the adverse childhood experiences that this kid was experiencing during his childhood, which may be different from yours or different from mine or other people."

{¶ 145} Dr. Swales relayed to the jury what Graham's family members told him about Graham's dysfunctional family life. We decline to speculate whether Graham's family could have provided other favorable mitigating testimony or would have been effective witnesses themselves. We conclude that counsel's decision not to call any family member as a mitigation witness was a "tactical

choice" that cannot rightly be viewed as ineffective assistance of counsel. *See Elmore*, 111 Ohio St.3d 515, 2006-Ohio-6207, 857 N.E.2d 547, at ¶ 121.

{¶ 146} Finally, Graham complains that defense counsel were ineffective in preparing him to give an unsworn statement. Graham presents no evidence that his counsel failed to prepare him for his statement, which was as follows: "I would like to say my heart goes out to the victim's family. Um, I know they probably can't forgive this, but mistakes do happen and people do learn from mistakes and I just hope the jury will understand that and give me a chance to learn." When asked whether he had anything further to say, Graham replied, "No. That's all." Graham, "*not counsel*, had the choice whether to testify or give an unsworn statement." (Emphasis added.) *State v. Brooks*, 75 Ohio St.3d 148, 157, 661 N.E.2d 1030 (1996). And it was Graham, not his counsel, who testified. There is simply no evidence that counsel did not prepare Graham for his statement. Furthermore, "the decision to give an unsworn statement is a tactical one, a call best made by those at the trial who can judge the tenor of the trial and the mood of the jury." *Id*. Thus, Graham cannot demonstrate that counsel were ineffective for allowing him to make this brief statement.

{¶ 147} Based on the foregoing, we reject proposition of law No. VII.

## H. Defense counsel failed to utilize an investigator

{¶ 148} In proposition of law No. X, Graham argues that defense counsel were ineffective by failing to use a defense investigator.

{¶ 149} Again, to prove ineffective assistance of counsel, Graham must demonstrate that counsel's performance fell below an objective standard of reasonable representation and that there exists a reasonable probability that but for counsel's deficient performance, the result of the trial would have been different. *Bradley,* 42 Ohio St.3d 136, 538 N.E.2d 373, at paragraphs two and three of the syllabus; *Strickland,* 466 U.S. at 688, 694, 104 S.Ct. 2052, 80 L.Ed.2d 674.

{¶ 150} Graham contends that defense counsel were ineffective by failing to accept the trial court's offer to appoint an investigator. During pretrial proceedings, the prosecutor mentioned that the state would not object to the appointment of an investigator to assist the defense in gathering mitigating evidence. The trial court informed defense counsel, "*[I]f you determine* that you need an investigator, the Court is willing to appoint an investigator." (Emphasis added.) Defense counsel never requested an investigator.

{¶ 151} Counsel has a duty "to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Strickland* at 691; *see State v. Decker*, 28 Ohio St.3d 137, 140, 502 N.E.2d 647 (1986). Graham argues that the failure to hire an investigator hindered the defense's ability to show that another person may have shot Massa. But Lewandowski and Haithcock and Graham's codefendants established that Graham was the killer. Lewandowski described seeing a man matching Graham's description shoot Massa. And Haithcock was in the bedroom with Grier and Kremling (whom Haithcock recognized despite Kremling's attempt to hide his face) when the shot was fired, which ruled them out. Moreover, Grier and Kremling testified that Graham had admitted shooting Massa, and Planicka, who testified that Kremling, Grier, and Graham arrived at and fled from the scene in his truck, corroborated Grier's and Kremling's testimony. Thus, using an investigator would not have helped the defense to identify someone else as the killer.

{¶ 152} Further, Graham presents nothing to show that defense counsel were deficient by not requesting an investigator to help collect mitigating evidence. As discussed regarding proposition of law No. VII, Crates, the mitigation specialist, spent numerous hours conducting his investigation. Graham does not identify any information that an investigator would have uncovered that Crates failed to obtain. In fact, it would be impossible to make such a showing without relying on evidence

outside the record, which is not permissible in a direct appeal. *See State v. Spaulding*, 151 Ohio St.3d 378, 2016-Ohio-8126, 89 N.E.3d 554, ¶ 171.

{¶ 153} Graham also argues that defense counsel should have used an investigator to locate and bring to court more mitigation witnesses. As discussed regarding proposition of law No. VII, the mitigation specialist spoke to several of Graham's family members before trial. Graham does not identify other witnesses who should have been located. Moreover, "[t]he defense decision to call or not call a mitigation witness is a matter of trial strategy." *Elmore*, 111 Ohio St.3d 515, 2006-Ohio-6207, 857 N.E.2d 547, at ¶ 116.

{¶ 154} We reject proposition of law No. X.

## I. Improper trial-court order permitting consumption of alcohol during sequestration

{¶ 155} In proposition of law No. II, Graham argues that the trial court erred by issuing an entry allowing the jurors to consume alcohol during sequestration. But defense counsel failed to object to the entry at trial and therefore Graham has forfeited all but plain error. *See State v. Payne*, 114 Ohio St.3d 502, 2007-Ohio-4642, 873 N.E.2d 306, at ¶ 23. Graham also argues that defense counsel were ineffective by failing to object to the trial court's order.

{¶ 156} The trial court filed a judgment entry on jury sequestration during the guilt-phase deliberations, which included the following order:

> After all deliberations have been concluded for any particular day of deliberations, any jurors so desiring may have alcoholic beverages between the hours of 6:00 p.m. and 10:00 p.m. each night, provided the total amount of beverages consumed by any juror each night shall not exceed three cocktails, three glasses of wine and three bottles or cans of beer. The cost of such beverages shall be paid for by the individual juror.

{¶ 157} Graham argues that the jurors may not have been competent to serve due to the possibility that they consumed a substantial amount of alcohol during sequestration. But the record shows that the jurors were never sequestered overnight. On November 3, 2016, the jurors began guilt-phase deliberations at 11:27 a.m. and concluded them that same day. Thus, the trial court's order never took effect.

{¶ 158} Graham also cannot show that defense counsel were ineffective by failing to object to this order, since the jury was never sequestered in the evening during deliberations.

{¶ 159} In his reply brief, Graham presents a new argument. He asserts that the order allowed the jurors to consume up to three alcoholic beverages in their homes on the night before the mitigation hearing began and thus minimized the seriousness of their duties. "Appellate courts generally will not consider a new issue presented for the first time in a reply brief." *State v. Quarterman*, 140 Ohio St.3d 464, 2014-Ohio-4034, 19 N.E.3d 900, ¶ 18. But regardless, the trial court's order did not apply to the jurors' use of alcohol at home. Thus, no error occurred.

{¶ 160} We reject proposition of law No. II.

### J. Defense counsel's heavy caseload and cumulative error

{¶ 161} In proposition of law No. XI, Graham raises an ineffective-assistance claim by arguing that defense counsel were unable to adequately defend him because of his lead counsel's heavy caseload. Graham also argues that the cumulation of defense counsel's errors resulted in his being denied the effective assistance of counsel. As noted previously in this opinion, both deficient performance and prejudice are required to justify reversal based on ineffective assistance of counsel. *See Bradley*, 42 Ohio St.3d 136, 538 N.E.2d 373, at paragraphs two and three of the syllabus; *Strickland*, 466 U.S. at 687, 104 S.Ct. 2052, 80 L.Ed.2d 674.

1. Defense counsel's caseload

**{¶ 162}** Graham complains that Anthony Koukoutas, his lead defense counsel, was working on two other death-penalty cases at the same time that he was defending him. During a hearing in March 2016, Koukoutas informed the court that he was defending a capital case in Mahoning County starting in June 2016 and another capital case in Stark County beginning at the end of September 2016. Graham also mentions that Koukoutas told the court at a July hearing, "I only got three hours of sleep last night, so I'm a little bit out of it," and that Koukoutas spent a day attending a Continuing Legal Education ("CLE") course during the trial. (We note that the court was not in session on the day of the CLE course.)

**{¶ 163}** Graham does not explain in what way he believes Koukoutas failed to adequately prepare for and investigate his case. Voir dire in his case did not begin until October 25, 2016, and the record does not show whether Koukoutas actually went to trial in the other capital cases or indicate how much time Koukoutas spent preparing for them. Graham was also represented by cocounsel, Frank Beane, and Graham does not raise issues regarding Beane's caseload.

**{¶ 164}** Graham cites *State v. Lorraine*, 11th Dist. Trumbull No. 2003-T-0159, 2005-Ohio-2529, and *State v. Burke*, 10th Dist. Franklin No. 04AP-1234, 2005-Ohio-7020, in arguing that a capital defendant has the right to two capital-qualified attorneys at all stages of the litigation and that both must be available, engaged, and prepared to litigate the case. Those cases held that a capital defendant pursuing an *Atkins* claim for the first time in a postconviction petition was entitled to the appointment of two certified attorneys. *Lorraine* at ¶ 51; *Burke* at ¶ 46; *see Atkins v. Virginia*, 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002) (Eighth Amendment to the United States Constitution prohibits the execution of an intellectually disabled defendant). Neither of those cases addressed a defense counsel's caseload when he or she is preparing for trial in a capital case.

{¶ 165} Indigent capital defendants are generally represented by multiple attorneys, and the attorneys may be supported by a team of other professionals, which may include a mitigation specialist and mental-health professionals, as was the case here. Appt.Coun.R. 5.10(A). Lead counsel "bear[s] overall responsibility for the performance of the defense team," but it is expected that he or she will "allocate, direct, and supervise the work of the defense team." Appt.Coun.R. 5.10(B). *See Spaulding*, 151 Ohio St.3d 378, 2016-Ohio-8126, 89 N.E.3d 554, at ¶ 55 ("The rules do not require both appointed counsel to be present at every pretrial hearing or every moment of trial"). Moreover, there is no requirement that appointed counsel represent only one capital defendant at a time.

{¶ 166} Finally, Graham asks that we consider Appt.Coun.R. 5.06, "Workload of counsel," when deciding whether his right to effective assistance of counsel was violated. That rule states:

> **(A) Consideration by Court**. In appointing an attorney as counsel for an indigent defendant in a capital case * * *, the court shall consider the nature and volume of the workload of the attorney to ensure the attorney, if appointed, can direct sufficient attention to the defense of the case and provide competent representation to the defendant.

(Boldface sic.)

{¶ 167} The day after appointing defense counsel, the trial court discussed setting a tentative trial date. Koukoutas informed the court that he had two pending death-penalty cases set for trial, one in June and one in September. The trial court said, "[Y]ou're going to be back to back to back." Koukoutas expressed concern that an August trial date would not leave enough time to gather all the material that he needed. The trial court responded, "You can ask for a continuance." It does

appear from the record that the trial court only belatedly considered counsel's workload. However, Graham fails to show how he was prejudiced. Moreover, when defense counsel expressed concern about having time to prepare for trial, the trial court assured counsel that he could request a continuance if necessary, and the trial ultimately did not start until October 25.

{¶ 168} In conclusion, Graham fails to demonstrate that Koukoutas provided ineffective assistance, and this claim is rejected.

2. Cumulative error

{¶ 169} In *State v. DeMarco*, 31 Ohio St.3d 191, 509 N.E.2d 1256 (1987), paragraph two of the syllabus, we recognized the doctrine of cumulative error. Under this doctrine, a conviction will be reversed when the cumulative effect of errors in a trial deprives a defendant of a fair trial even though each of the numerous errors does not individually constitute cause for reversal. *Id.*; *see also State v. Powell*, 132 Ohio St.3d 233, 2012-Ohio-2577, 971 N.E.2d 865, ¶ 223.

{¶ 170} As an initial matter, Graham asks that we overrule *State v. Hill*, 75 Ohio St.3d 195, 661 N.E.2d 1068 (1996). He asserts that *Hill* holds that ineffective assistance of counsel *cannot be found* based on cumulative error, but this is a misinterpretation of *Hill*. *Hill* rejected a claim of cumulative error, stating, "Hill received a fair trial, few errors were found, and any error found did not prejudice his substantial rights. Such errors cannot become prejudicial by sheer weight of numbers." *Id*. at 212. *Hill* does not hold that cumulative errors can never result in ineffective assistance of counsel. Each assertion of ineffective assistance of counsel going to cumulative error depends on the merits of each individual claim; when none of the individual claims of ineffective assistance of counsel have merit, cumulative error cannot be established simply by joining those meritless claims together. *See, e.g., State v. Dean*, 146 Ohio St.3d 106, 2015-Ohio-4347, 54 N.E.3d 80, ¶ 296; *State v. Mammone*, 139 Ohio St.3d 467, 2014-Ohio-1942, 13 N.E.3d 1051, ¶ 173.

{¶ 171} Graham argues that *Hill* must be overruled to comply with Sixth Circuit precedent. Graham invokes *Campbell v. United States*, 364 F.3d 727 (6th Cir.2004), which states that "trial-level errors that would be considered harmless when viewed in isolation of each other might, when considered cumulatively, require reversal of a conviction." *Id*. at 736, citing *United States v. Parker*, 997 F.2d 219, 221 (6th Cir.1993). But Graham fails to mention that *Campbell* further states that "the *accumulation of non-errors* cannot collectively amount to a violation of due process." (Emphasis added.) *Id*. In any event, nothing in *Hill* conflicts with *Campbell*.

{¶ 172} There is no merit to Graham's assertion that the cumulation of counsel's alleged errors resulted in ineffective assistance, because with regard to only one claim did we find that counsel erred—counsel's failure to object to the admission of the photo of Graham holding two firearms—and that error did not result in prejudice that deprived him of a fair trial. As explained in discussing other propositions of law, Graham failed to establish ineffective assistance of counsel based on counsel's (1) failure to be prepared because of lead counsel's involvement in two other death-penalty cases, (2) failure to challenge a jury pool tainted by racial prejudice, (3) failure to object to the trial court's order permitting the jurors to consume alcoholic beverages during sequestration, (4) failure to object to a photograph showing Graham with two firearms, (5) failure to hire an investigator, and (6) failure to call more witnesses during mitigation. *See State v. Clinton*, 153 Ohio St.3d 422, 2017-Ohio-9423, 108 N.E.3d 1, ¶ 41.

{¶ 173} Based on the foregoing, we reject proposition of law No. XI.

### K. Sentencing opinion

{¶ 174} In proposition of law No. XIV, Graham argues that the trial court's sentencing opinion should have mentioned that he is an African American male.

{¶ 175} R.C. 2929.03(F) sets forth the findings a trial court must make when imposing a death sentence. The statute requires that the court state in a separate opinion

> its specific findings as to the existence of any of the mitigating factors set forth in division (B) of section 2929.04 of the Revised Code, the existence of any other mitigating factors, the aggravating circumstances the offender was found guilty of committing, and the reasons why the aggravating circumstances the offender was found guilty of committing were sufficient to outweigh the mitigating factors.

{¶ 176} The sentencing opinion in this case discusses the mitigating factors presented at trial. The sentencing opinion does not mention that Graham is African American.

{¶ 177} Graham argues that the trial court should have mentioned that he is African American, because of the racial slurs and racist comments that were made by some members of the jury pool. However, as discussed regarding proposition of law No. I, the trial court excused the prospective jurors who made racist comments and racial slurs. The trial court did not need to discuss those incidents in its sentencing opinion. Accordingly, we hold that the trial court committed no error by not mentioning that Graham is African American in its sentencing opinion.

{¶ 178} Based on the foregoing, we reject proposition of law No. XIV.

## L. Constitutionality of death sentence for a defendant who was under 21 at time of crime

{¶ 179} In proposition of law No. IX, Graham essentially argues that imposing a death sentence on a capital defendant who was under 21 years old at the

time of the crime violates the Eighth Amendment. Graham does not raise a similar argument under Article I, Section 9 of the Ohio Constitution. Because Graham failed to raise this issue at trial, he has forfeited all but plain error. Graham also argues that defense counsel were ineffective by failing to raise this issue at trial.

{¶ 180} Graham turned 19 years old the month before he committed these crimes. Graham asserts his belief that all the other inmates currently on Ohio's death row were older than 19 years and one month when they committed their capital crimes. But we have upheld death sentences in cases in which the defendant committed aggravated murder at the age of 19 or younger. *See State v. Pickens*, 141 Ohio St.3d 462, 2014-Ohio-5445, 25 N.E.3d 1023, ¶ 252 (age 19), *overruled on other grounds, State v. Bates*, 159 Ohio St.3d 156, 2020-Ohio-634, 149 N.E.3d 475; *Lang*, 129 Ohio St.3d 512, 2011-Ohio-4215, 954 N.E.2d 596, at ¶ 337 (age 19); *State v. Bethel*, 110 Ohio St.3d 416, 2006-Ohio-4853, 854 N.E.2d 150, ¶ 203 (age 18); *Noling*, 98 Ohio St.3d 44, 2002-Ohio-7044, 781 N.E.2d 88, at ¶ 149 (age 18); and *State v. Franklin*, 97 Ohio St.3d 1, 2002-Ohio-5304, 776 N.E.2d 26, ¶ 98 (age 18).

{¶ 181} In *Roper v. Simmons*, 543 U.S. 551, 568, 575, 125 S.Ct. 1183, 161 L.Ed.2d 1 (2005), the United States Supreme Court held that it was unconstitutional to impose a death sentence on anyone who was under 18 years of age at the time of the offense. In reaching this conclusion, the court referred to " 'the evolving standards of decency that mark the progress of a maturing society' to determine which punishments are so disproportionate as to be cruel and unusual." *Id*. at 561, quoting *Trop v. Dulles,* 356 U.S. 86, 101, 78 S.Ct. 590, 2 L.Ed.2d 630 (1958) (plurality opinion).

{¶ 182} Extrapolating from this decision, Graham argues that "it is possible" that the United States Supreme Court could extend *Roper* to find that a defendant who turned 19 the month before committing the offense is constitutionally barred from receiving a death sentence. But because the United

States Supreme Court has drawn the line at 18 for Eighth Amendment purposes, state courts are not free to invoke the Eighth Amendment as authority for drawing it at a higher age. *See In re Phillips*, 6th Cir. No. 17-3729, 2017 WL 4541664, *2-3 (July 20, 2017) (no authority exists at the present time to support the argument that a defendant who was 19 years old at the time of the offense is ineligible to receive a death sentence). "It has long been settled that the Supremacy Clause binds state courts to decisions of the United States Supreme Court on questions of federal statutory and constitutional law." *State v. Burnett*, 93 Ohio St.3d 419, 422, 755 N.E.2d 857 (2001). And as the United States Supreme Court has cautioned,

> [i]f a precedent of [the United States Supreme Court] has direct application in a case, yet appears to rest on reasons rejected in some other line of decisions, the [lower courts] should follow the case which directly controls, leaving to [the United States Supreme Court] the prerogative of overruling its own decisions.

*Rodriquez de Quijas v. Shearson/Am. Express, Inc.*, 490 U.S. 477, 484, 109 S.Ct. 1917, 104 L.Ed.2d 526 (1989). *Roper* is controlling, and we must follow it. We do not find plain error.

{¶ 183} As for his ineffective-assistance-of-counsel argument, Graham does not show that counsel were ineffective by failing to challenge the imposition of a death sentence due to Graham's age at the time of the crime. Graham has not shown that there was a reasonable probability that the outcome of the proceeding would have been different based on this constitutional claim.

{¶ 184} Based on the foregoing, we reject proposition of law No. IX.

56

## M. Violation of *Hurst v. Florida*

{¶ 185} In proposition of law No. XII, Graham argues that Ohio's capital-sentencing procedures violate the Sixth Amendment right to a jury trial as construed in *Hurst v. Florida*, __U.S.__, 136 S.Ct. 616, 193 L.Ed.2d 504 (2016). In *Hurst*, the United States Supreme Court held that Florida's capital scheme violated the Sixth Amendment because it "required the judge alone to find the existence of an aggravating circumstance," *id.* at 624, and the jury was "not require[d] * * * to make the critical findings necessary to impose the death penalty," *id*. at 622. In *State v. Mason*, 153 Ohio St.3d 476, 2018-Ohio-1462, 108 N.E.3d 56, we held that Ohio's death-penalty scheme is not unconstitutional under *Hurst*.

{¶ 186} But Graham asks us to overturn *Mason*, arguing that a trial court's fact-finding, even if it mirrors the jury's fact-finding, violates the Sixth Amendment. Graham cites no authority for this claim. And his arguments are similar to those that were raised and rejected in *Mason*. *Id.* at ¶ 39-42. Therefore, we reject proposition of law No. XII.

## N. Proportionality review by trial court

{¶ 187} In proposition of law No. XIII, Graham contends that his death sentence is unconstitutional because the trial court did not "evaluate [it] for proportionality in relation to other heinous crimes." This claim fails.

{¶ 188} Contrary to Graham's claims, R.C. 2929.05(A) does not require a *trial court* to engage in proportionality review. Instead, this provision requires an *appellate court* to review every death sentence for proportionality. By contrast, R.C. 2929.03(F) sets forth the requirements for a trial court's sentencing opinion in a capital case. This provision says nothing about the trial court's conducting a proportionality analysis.

{¶ 189} Therefore, we reject proposition of law No. XIII.

## V. INDEPENDENT SENTENCE EVALUATION

{¶ 190} Having completed our review of Graham's propositions of law, we are required by R.C. 2929.05(A) to independently review Graham's death sentence for appropriateness. In conducting this review, we must determine whether the evidence supports the jury's finding of aggravating circumstances, whether the aggravating circumstances outweigh the mitigating factors, and whether death is the appropriate sentence. R.C. 2929.05(A); *see State v. Johnson,* 144 Ohio St.3d 518, 2015-Ohio-4903, 45 N.E.3d 208, ¶ 99.

### A. Aggravating circumstances

{¶ 191} Graham was convicted of murdering Massa while committing aggravated robbery, R.C. 2929.04(A)(7), while committing aggravated burglary, R.C. 2929.04(A)(7), and while committing kidnapping, R.C. 2929.04(A)(7). The evidence at trial supports the jury's findings of guilt as to the three aggravating circumstances.

### B. Mitigating factors

{¶ 192} Against these aggravating circumstances, we must weigh any of the relevant mitigating factors provided in R.C. 2929.04(B). These factors include

- the nature and circumstances of the offense, R.C. 2929.04(B),

- the history, character, and background of the offender, R.C. 2929.04(B),

- whether the victim of the offense induced or facilitated it, R.C. 2929.04(B)(1),

- whether it is unlikely that the offense would have been committed but for the fact that the offender was under duress, coercion, or strong provocation, R.C. 2929.04(B)(2),

- whether, at the time of committing the offense, the offender, because of a mental disease or defect, lacked substantial capacity to appreciate the

criminality of the offender's conduct or to conform the offender's conduct to the requirements of the law, R.C. 2929.04(B)(3),

- the youth of the offender, R.C. 2929.04(B)(4),

- the offender's lack of a significant history of prior criminal convictions and delinquency adjudications, R.C. 2929.04(B)(5),

- if the offender was a participant in the offense but not the principal offender, the degree of the offender's participation in the offense and the degree of the offender's participation in the acts that led to the death of the victim, R.C. 2929.04(B)(6),

- and any other factors that are relevant to the issue whether the offender should be sentenced to death, R.C. 2929.04(B)(7).

### 1. Graham's background

{¶ 193} Graham was the second child born to his mother, and she had him when she was 19 years old. He had very little contact with his father, who was often in and out of prison. Graham did not have a consistent home environment, as he lived off and on with his maternal grandmother throughout his childhood.

{¶ 194} Graham was also exposed to domestic violence in his home life. Graham's mother raised Graham the way that she was raised and disciplined him with a belt. According to Dr. Swales, the psychologist hired by the defense, in the year before the murder, Graham's grandmother was convicted of domestic violence for a confrontation she had with Graham's mother and his sister. Even though Graham was not the victim of that instance of violence, as Dr. Swales said, it is an example of "the adverse childhood experiences that [Graham] was experiencing during his childhood."

{¶ 195} Further, although Graham lived in well-kept homes with his mother and grandmother, the homes were located in neighborhoods in which there was substantial drug activity. Dr. Swales stated: "[Graham] got involved in the wrong

crowd. He was one of those adolescents who got socialized into aggression because that's what his friends were doing, all kinds of ridiculous things that no rational person, no person in their right mind would do."

### 2. Mental-health and substance-abuse issues

{¶ 196} In addition to the adverse environmental factors, the evidence in the record shows that Graham suffered from both mental-health issues and substance-use disorder. Graham was diagnosed with two mental-health issues: oppositional defiant disorder and conduct disorder. *See* Cavanagh, Quinn, Duncan, Graham & Balbuena, *Oppositional Defiant Disorder Is Better Conceptualized as a Disorder of Emotional Regulation*, Journal of Attention Disorders, 21(5), 381-389 (2017), abstract available at https://doi.org/10.1177/1087054713520221 (accessed Oct. 8, 2020) [https://perma.cc/K7AP-MAUL] (oppositional defiant disorder is better classified as a disorder of emotion regulation rather than as behavior disorder); Noordermeer, Luman & Oosterlaan, *A Systematic Review and Meta-analysis of Neuroimaging in Oppositional Defiant Disorder (ODD) and Conduct Disorder (CD) Taking Attention-Deficit Hyperactivity Disorder (ADHD) Into Account*, Neuropsychology Review, 26(1), 44–72 (2016), available at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC4762933/ (accessed Oct. 8, 2020) [https://perma.cc/JW2U-SFRR] (oppositional defiant disorder and conduct disorder are the most commonly diagnosed mental-health conditions in childhood). Despite these mental-health issues and despite the fact that Graham clearly had problems stemming from these issues, Graham did not receive treatment. Dr. Swales testified that testing confirmed that Graham was not faking his mental-health issues.

{¶ 197} Graham's substance-abuse problems further contributed to his behavioral issues. Graham was marijuana dependent. He first used marijuana when he was in seventh grade, and he began using it on a daily basis as a teenager.

Despite his pediatrician's knowledge of his usage, Graham was not referred for treatment.

{¶ 198} It was only after intervention from the juvenile court that Graham received some treatment for substance-use disorder related to his marijuana usage. However, Dr. Swales testified that Graham received inadequate treatment for his issues. Graham attended seven counseling sessions, and the counselor recommended additional counseling and anger management. Graham's mother did not participate in these sessions, and she discontinued the sessions because she did not feel they were necessary.

{¶ 199} Graham's substance-abuse problems escalated when he became addicted to Xanax and used it in combination with Adderall occasionally. Dr. Swales testified that Graham was "using massive amounts of Xanax on a daily basis at the time of this instant offense." Graham admitted to Dr. Swales that "he would use a high amount, one to one-and-a-half bars of Xanax per day." Dr. Swales testified that taking such a dosage every day would result in aggression, irritability, sleep difficulties, and tremors. Graham told Dr. Swales that while on Xanax, he was more aggressive and got into unprovoked fights with his friends. Dr. Swales testified: "In my opinion, it's unlikely that [Graham] would've committed the offense of murder, but for the fact he was addicted to Xanax, a benzodiazepine. I believe that the Xanax led to the disinhibited behavior and the aggression."

### 3. Age

{¶ 200} Graham had only recently turned 19 years old when he committed these crimes with three 17-year-olds. Dr. Swales mentioned Graham's youth as a mitigating factor, stating that at 19 years old, Graham "didn't demonstrate a maturity of an adult in any of the decisions that he made."

### 4. Adjustment to prison life

{¶ 201} Graham succeeded when he had structure and was sober. Graham received As and Bs in elementary school. He started having behavioral problems

in middle school and his grades worsened (his GPA fell to 1.0), he was truant, and he ran away from home, all while using marijuana on a daily basis. Graham's grades ranged from Bs to Fs in the 9th and 10th grades. He repeated the 10th grade. Graham was sent to the Multi-County Juvenile Attention System, a program for delinquent youth, and was almost a straight-A student when he finished. But he did not attend school beyond the 11th grade.

{¶ 202} Additionally, during the ten months that Graham was in custody at the Portage County jail awaiting trial in this case, he committed no major violations. Accordingly, Dr. Swales testified that he believes that Graham would adjust well to prison.

### 5. Unsworn statement

{¶ 203} Graham, in an unsworn statement, expressed sympathy and requested an opportunity to learn from his mistakes. He said, "I would like to say my heart goes out to the victim's family. Um, I know they probably can't forgive this, but mistakes do happen and people do learn from mistakes and I just hope the jury will understand that and give me a chance to learn."

## C. Weighing

{¶ 204} We must determine whether the felony-murder aggravating circumstances that were found by the jury outweigh the mitigating factors presented in this case beyond a reasonable doubt. R.C. 2929.05(A) and 2929.03(D)(1); *see Johnson*, 144 Ohio St.3d 518, 2015-Ohio-4903, 45 N.E.3d 208, at ¶ 140. We determine that they do not.

{¶ 205} The following mitigating factors enumerated in R.C. 2929.04(B) do not contribute any mitigating weight: the nature and the circumstances of the offense, R.C. 2929.04(B); inducement by the victim, R.C. 2929.04(B)(1); offender under duress, coercion, or strong provocation, R.C. 2929.04(B)(2); offender lacked substantial capacity due to mental disease or defect, R.C. 2929.04(B)(3); offender's lack of significant criminal history, R.C. 2929.04(B)(5); and offender was not the

principal offender, R.C. 2929.04(B)(6). Massa's tragic and senseless death was a result of a poorly thought out and horrifically executed robbery of a drug dealer by a group of teenagers. It is true that Graham was not the mastermind—it was Kremling, his 17-year-old friend who recruited him and the other teenagers, Grier and Planicka, to participate in the robbery of Kremling's former classmate and drug-dealing acquaintance, Haithcock. But it was Graham, according to his codefendants, who led the charge into the apartment, demanded and collected money from Haithcock, ordered two of the victims, Massa included, to wait on the couch, and then shot Massa when his authority was challenged.

{¶ 206} Nevertheless, there is strong and compelling mitigating evidence regarding Graham's history and background and other mitigating factors enumerated in R.C. 2929.04(B)—youth of the offender (R.C. 2929.04(B)(4)) and the catchall provision (R.C. 2929.04(B)(7))—that have significant weight.

{¶ 207} This court must consider Graham's youth as a mitigating factor pursuant to R.C. 2929.04(B)(4). We acknowledge that this court has not always considered the youth of the offender to be a strong factor, and it has occasionally given it nominal weight. *See State v. Goodwin*, 84 Ohio St.3d 331, 350, 703 N.E.2d 1251 (1999) (offender's age of 19 entitled to "nominal weight"), *writ of habeas corpus granted in part on other grounds sub nom. Goodwin v. Johnson*, N.D.Ohio No. 1:99CV2963, 2006 WL 753111 (Mar. 22, 2006); *Noling*, 98 Ohio St.3d 44, 2002-Ohio-7044, 781 N.E.2d 88, at ¶ 149 ("We do not * * * necessarily regard age as a strong or compelling mitigating factor"). However, there is more recent case law in which this court has given youth somewhat more weight in this analysis. *See Bethel*, 110 Ohio St.3d 416, 2006-Ohio-4853, 854 N.E.2d 150, at ¶ 203 (the defendant's youth provided "some weight" in mitigation; the defendant was only a few months over 18 at the time of the offenses); *Lang*, 129 Ohio St.3d 512, 2011-Ohio-4215, 954 N.E.2d 596, at ¶ 337 (the defendant's youth provided significant mitigating weight; the defendant turned 19 a few days before committing the

offenses ); *Pickens*, 141 Ohio St.3d 462, 2014-Ohio-5445, 25 N.E.3d 1023, at ¶ 252 (the defendant's youth provided significant mitigating weight; the defendant was 19 at the time of the offenses). Therefore, we consider Graham's youth—he turned 19 the month before he committed the offenses with three teenagers—to be a factor that carries significant weight.

{¶ 208} We also find that Graham's background is entitled to some weight. Evidence presented at trial demonstrated that Graham had a troubled upbringing. He grew up in a dysfunctional family in an unstable home environment, where he observed combative and violent behavior by his immediate family members and was the recipient of corporal punishment at the hand of his mother. We have "seldom given decisive weight" to this factor, *Hale*, 119 Ohio St.3d 118, 2008-Ohio-3426, 892 N.E.2d 864, at ¶ 265, but the mitigating evidence presented in this case demonstrates that Graham's history and background are entitled to some weight. *See State v. Bey*, 85 Ohio St.3d 487, 508, 709 N.E.2d 484 (1999) (history and background including unstable and abusive home environment entitled to some weight in mitigation); *Hale* at ¶ 265 (history and background including one unstable and irresponsible parent and an unstable home environment entitled to some weight in mitigation).

{¶ 209} Graham also has a history of mental-health issues. He has been diagnosed with oppositional defiant disorder and conduct disorder. While these disorders do not qualify as mitigating under R.C. 2929.04(B)(3), *see State v. Neyland*, 139 Ohio St.3d 353, 2014-Ohio-1914, 12 N.E.3d 1112, ¶ 298, they are serious disorders experienced by some children and adolescents, and Graham did not receive adequate treatment for them. Thus, we give some weight to Graham's mental-health problems under R.C. 2929.04(B)(7). *See Clinton*, 153 Ohio St.3d 422, 2017-Ohio-9423, 108 N.E.3d 1, at ¶ 296.

{¶ 210} To make matters worse, Graham was dependent on marijuana and never received adequate treatment for this dependency—neither his pediatrician

nor his mother sought treatment for his marijuana use. It was not until the juvenile court intervened that Graham received some treatment, but that treatment was minimal, and it was deemed inadequate by the psychologist hired by the defense. Even assuming arguendo that his brief treatment regimen was adequate by medical standards, Graham's substance-abuse issues only escalated throughout his teen years, with Graham becoming addicted to Xanax and occasionally using Adderall. It was this addiction to Xanax that caused Graham to become less inhibited and more aggressive. Thus, we give Graham's substance-abuse issues some weight in mitigation. *See State v. Tibbetts*, 92 Ohio St.3d 146, 174, 749 N.E.2d 226 (2001) ("we have accorded some weight to drug addiction in mitigation").

{¶ 211} From Dr. Swales's testimony outlining Graham's mental-health and substance-abuse issues and his educational successes and failures, we can see that Graham does well when he is in a stable and structured environment and is not on drugs. He succeeded academically when placed in a structured environment by the juvenile court, and he did not commit any major infractions while in jail awaiting trial. Further, Dr. Swales's opined that Graham would adapt well to prison life. Therefore, we give some weight as a mitigating factor under R.C. 2929.04(B)(7) to Graham's ability to adapt to life in prison. *See State v. Foust*, 105 Ohio St.3d 137, 2004-Ohio-7006, 823 N.E.2d 836, ¶ 200.

{¶ 212} Finally, Graham's expression of sympathy toward Massa's family is also entitled to some weight. *See Wilks,* 154 Ohio St.3d 359, 2018-Ohio-1562, 114 N.E.3d 1092, at ¶ 244.

{¶ 213} There is no doubt that Graham's murder of Massa was a senseless, horrific, and appalling act. But considering the aggravating circumstances and weighing them against the mitigating factors in this case, we do not find that the aggravating circumstances outweigh the mitigating factors beyond a reasonable doubt. Viewing the mitigating factors cumulatively, "the mitigation evidence

militates against imposing the death sentence," *see Johnson*, 144 Ohio St.3d 518, 2015-Ohio-4903, 45 N.E.3d 208, at ¶ 139.

{¶ 214} We recognize that we have upheld death sentences in other cases in which the offender was 19 or younger, had mental-health and substance-abuse issues, and had an unstable home life, *see*, *e.g.*, *State v. Raglin,* 83 Ohio St.3d 253, 699 N.E.2d 482 (1998), and *State v. Spivey*, 81 Ohio St.3d 405, 692 N.E.2d 151 (1998). But those cases are distinguishable given developments in the case law on the weight to be given to the mitigating factors of youth and mental-health issues. And we must independently examine each case on its own unique facts.

{¶ 215} Our conclusion is supported by our decision in *Johnson*, a case in which this court vacated the defendant's death sentence based on the cumulative weight of the mitigating factors. Like Graham, Johnson entered a residence to commit robbery and murdered a person inside. But Johnson was also similar to Graham in that he was 19 at the time of the murder, he had had a troubled childhood, suffered from mental-health issues, and was dependent on drugs, including marijuana. We found in that case that the aggravating circumstances did not outweigh the cumulative effect of the mitigating evidence beyond a reasonable doubt, based upon the specific facts of that case. And we find similarly today.

{¶ 216} Thus, based upon an independent review of the evidence, we cannot conclude that the aggravating circumstances that Graham was found guilty of committing outweigh the mitigating factors present in the case beyond a reasonable doubt. R.C. 2929.05(A). Therefore, a sentence of death is not appropriate in this case.

## VI. CONCLUSION

{¶ 217} We affirm Graham's convictions. We vacate his death sentence and remand the cause to the trial court for resentencing consistent with R.C. 2929.06.

Judgment of convictions affirmed,

death sentence vacated,

and cause remanded.

O'CONNOR, C.J., and FRENCH, J., concur.

DONNELLY, J., concurs, with an opinion.

STEWART, J., concurs in judgment only.

KENNEDY, J., concurs in judgment only in part and dissents in part, with an opinion joined (except for paragraphs 246-257 and 263) by DEWINE, J.

---

**DONNELLY, J., concurring.**

{¶ 218} Respectfully, I concur in the court's judgment affirming the convictions entered against appellant, Damantae Graham, vacating his death sentence, and remanding the cause for a resentencing hearing in accordance with R.C. 2929.06(A). I agree with the majority's determination pursuant to its independent sentence evaluation that a sentence of death is not appropriate in light of the unique aggravating and mitigating factors in this case. But I would fully address Graham's argument on the proper scope of proportionality review. I believe that a sentence of death is disproportionate and excessive in this case and that Graham's death sentence would need to be vacated irrespective of the court's conclusion that the aggravating circumstances that Graham was found guilty of committing did not outweigh the mitigating factors beyond a reasonable doubt.

{¶ 219} I recognize that my position is outside the norm, since this court has never once in the entire history of proportionality review reversed a death sentence on the ground that it was "excessive or disproportionate to the penalty imposed in similar cases," R.C. 2929.05(A). The norm is wrong. Proportionality review in Ohio is woefully superficial and perfunctory, and it fails both to comply with the plain language of R.C. 2929.05(A) and to ensure basic constitutional protections.

{¶ 220} Although states are not constitutionally required to enact proportionality-review laws, *Pulley v. Harris*, 465 U.S. 37, 43-44, 104 S.Ct. 871, 79 L.Ed.2d 29 (1984), Ohio has had such a law in place since 1981, R.C. 2929.05, Am.Sub.S.B. No. 1, 139 Ohio Laws, Part I, 1, 17-18 (effective Oct. 19, 1981). But when this court applies the proportionality provision of R.C. 2929.05(A), it does not actually provide meaningful review of the issue so as to prevent the arbitrary, capricious, and disproportionate imposition of the death penalty, which *is* constitutionally required, *Gregg v. Georgia*, 428 U.S. 153, 188, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976) (lead opinion), citing *Furman v. Georgia*, 408 U.S. 238, 310, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972) (White, J., concurring); *see also Pulley* at 54 (Stevens, J., concurring in part and concurring in the judgment). In other words, the form is not constitutionally required, but the substance is. And in Ohio we have it backwards: we have the form but lack the substance.

{¶ 221} If Ohio had an adequately narrow pool of offenses that were eligible for the death penalty, then a statutorily mandated check on the proportionality of the sentence might not be necessary. *See Zant v. Stephens*, 462 U.S. 862, 877, 103 S.Ct. 2733, 77 L.Ed.2d 235 (1983) ("an aggravating circumstance must genuinely narrow the class of persons eligible for the death penalty and must reasonably justify the imposition of a more severe sentence on the defendant compared to others found guilty of murder"). An adequately narrowed classification of capital aggravated murder alone might ensure that "sentences of death will not be 'wantonly' or 'freakishly' imposed." *Jurek v. Texas*, 428 U.S. 262, 276, 96 S.Ct. 2950, 49 L.Ed.2d 929 (1976), quoting *Furman* at 310 (Stewart, J., concurring). But Ohio's classification scheme is not adequately narrow, and our pool of death-eligible offenses is enormous. Any murder that occurs in conjunction with a felony such as robbery is eligible.[1] Felony murder is

---

1. R.C. 2903.01 provides:

particularly problematic under Ohio's statutory scheme because the felony is the element that elevates the murder offense to aggravated murder, R.C. 2903.01(B), and the felony is also the element that elevates the maximum penalty for aggravated murder from life imprisonment to death, R.C. 2929.04(A)(7); R.C. 2929.02. A cold-blooded murderer who acted with prior calculation and design and committed the murder in a particularly brutal manner is not eligible for the death penalty unless an additional aggravating factor under R.C. 2929.04(A) can be proved. But every single robbery-murder is eligible for the death penalty without the need to prove any additional factor.

{¶ 222} Given the extreme breadth of the death-eligible category of offenses in Ohio—particularly felony murder—our proportionality review is all the more important in order to ensure that the death penalty is not imposed "capriciously or in a freakish manner," *Gregg* at 195 (lead opinion). This court's practice, though, is to dispose of the proportionality issue with a single sentence, indicating that the death penalty has been imposed at some point in history in a capital case involving the same aggravating factor or factors. *See*, *e.g.*, *State v. Roberts*, 150 Ohio St.3d 47, 2017-Ohio-2998, 78 N.E.3d 851, ¶ 116; *State v. Jones*, 135 Ohio St.3d 10, 2012-Ohio-5677, 984 N.E.2d 948, ¶ 266; *State v. Frazier*, 115 Ohio St.3d 139, 2007-Ohio-5048, 873 N.E.2d 1263, ¶ 270; *State v. Hoffner*, 102 Ohio St.3d 358, 2004-Ohio-3430, 811 N.E.2d 48, ¶ 121; *State v. Thomas*, 97 Ohio St.3d 309, 2002-Ohio-6624, 779 N.E.2d 1017, ¶ 124; *State v. Bays*, 87 Ohio St.3d 15, 34, 716 N.E.2d 1126 (1999). This approach is overly narrow, and its result is overbroad.

---

(B) No person shall purposely cause the death of another * * * [in conjunction with] kidnapping, rape, aggravated arson, arson, aggravated robbery, robbery, aggravated burglary, burglary, trespass in a habitation when a person is present or likely to be present, terrorism, or escape.
* * *
(G) Whoever violates this section is guilty of aggravated murder * * *.

{¶ 223} The court's approach is overly narrow because it compares the case at hand solely to other cases in which the death penalty was imposed, and the cases cited as being similar are often not factually comparable. I agree with the statement of United States Supreme Court Justice Stevens that consideration of similarly situated defendants who have *not* been sentenced to death "is an essential part of any meaningful proportionality review," *Walker v. Georgia*, 555 U.S. 979, 980, 129 S.Ct. 453, 172 L.Ed.2d 344 (2008) (Stevens, J., statement respecting the denial of certiorari). Moreover, the plain language of R.C. 2929.05 obligates this court to compare more than just cases in which the death penalty was imposed.

{¶ 224} Our obligation to consider similarly situated defendants receiving varying penalties is clear from the words that the General Assembly chose to use in the proportionality provision of R.C. 2929.05. When "determining whether the sentence of death is appropriate," we are required to "consider whether the *sentence* is excessive or disproportionate to the *penalty* imposed in *similar cases*." (Emphasis added.) R.C. 2929.05(A). There are two distinct words for punishment in this sentence—"sentence" and "penalty." First, it refers to "the sentence of death" and then "the sentence" as shorthand for "sentence of death." Second, it refers to "the penalty" in similar cases. If the General Assembly had intended to limit the comparison solely to death sentences, it would have used "sentence" or "death sentence" for the second term. But the General Assembly did not do that. It used the more expansive term "penalty." The phrasing of R.C. 2929.05 commands this court to compare the *different penalties* imposed in *similar cases*; it plainly does not instruct us to compare the different circumstances underlying identical death sentences.

{¶ 225} The result of this court's typical proportionality "review" is overbroad because its one-sentence analysis is no more than a confirmation that the murder offense in the case fits within the expansive category of death-eligible offenses. The "analysis" does nothing to narrow that category and therefore does

nothing to "justify the imposition of a more severe sentence on the defendant compared to others found guilty of murder," *Zant*, 462 U.S. at 877, 103 S.Ct. 2733, 77 L.Ed.2d 235. The fact that this court does not perform effective proportionality reviews does not mean that every case upholding a death sentence permits a disproportionate sentence to be carried out, but it does mean that the court does not identify the sentences that *are* so disproportionate that they violate fundamental constitutional principles.

{¶ 226} I believe that the appropriate course is for this court to depart from the charade of proportionality review described above. Justifying such a departure is not particularly complicated, since this court's decisions that set the tone for proportionality review provided remarkably little analysis in support. *State v. Jenkins*, 15 Ohio St.3d 164, 209, 473 N.E.2d 264 (1984); *State v. Steffen*, 31 Ohio St.3d 111, 123, 509 N.E.2d 383 (1987).

{¶ 227} In *Jenkins* this court baldly stated, with no analysis whatsoever, that R.C. 2929.05 does not require the court to include noncapital murder cases in its death-penalty proportionality review. *Id.* at 209. It noted, though, that R.C. 2929.021, which directs clerks of trial courts to notify this court of all capitally charged cases filed in their courts *regardless of the outcome*, is an important tool for proportionality review. *Id.* at 208-209.

{¶ 228} This court in *Steffen* did not go much further than *Jenkins* in its analysis to justify its refusal to provide meaningful proportionality review and instead leaned heavily on the unfounded notion that "logic dictates" the result. *Steffen* at 123. The only specific justification it provided for so limiting the pool of cases for comparison was that "[c]omparison with cases not passed upon by the reviewing court would be unrealistic since the reviewing court could not possess the requisite familiarity with the particular circumstances of such cases so essential to a determination of appropriateness," *id*. This reasoning appears to be at odds with the language in *Jenkins* indicating that all capitally charged cases, regardless

of the outcome, should be used for comparison, *id.* at 208-209. Moreover, if this court had actually followed *Steffen* in the last 33 years, one would expect to see at least one example of this court's overturning the death sentence in a case after a thorough comparison of the circumstances of the case with the particular circumstances of cases that this court had previously reviewed. But there is no such example. We have spent decades debunking the notion that "a court cannot make a meaningful proportionality review unless the pool of cases is restricted to those which the reviewing court has itself decided," *id.* at 123, by refusing to provide meaningful proportionality review with the pool of cases that this court itself *has* decided.

{¶ 229} While the doctrine of stare decisis is certainly "of fundamental importance to the rule of law," *Wampler v. Higgins*, 93 Ohio St.3d 111, 120, 752 N.E.2d 962 (2001), the doctrine "should not be, and has never been, used as the sole reason for the perpetuation of a stated rule of law which has proved to be unsound and unjust." *Carter-Jones Lumber Co. v. Eblen*, 167 Ohio St. 189, 196-197, 147 N.E.2d 486 (1958). The holding announced in *Jenkins* and *Steffen* works an unjust result, and this court's reliance on the cases over the decades has done nothing to strengthen their logic. This court has not considered the rationale (or lack thereof) of the holding but has instead parroted it over and over through the decades. Our rejections of arguments in favor of an appropriate proportionality review have been as terse and meaningless as the proportionality review itself. *See, e.g.*, *State v. Wilks*, 154 Ohio St.3d 359, 2018-Ohio-1562, 114 N.E.3d 1092, ¶ 249; *State v. Spaulding*, 151 Ohio St.3d 378, 2016-Ohio-8126, 89 N.E.3d 554, ¶ 183; *State v. Sowell*, 148 Ohio St.3d 554, 2016-Ohio-8025, 71 N.E.3d 1034, ¶ 151. Because this court's precedent regarding proportionality review offers not justice but unfairness, departure from the precedent is justified. *See Clark v. Southview Hosp. & Family Health Ctr.*, 68 Ohio St.3d 435, 438, 628 N.E.2d 46 (1994).

Moreover, it would work no hardship on this court to simply stop emptily invoking it.

{¶ 230} In cases, like this one, that involve black defendants and white victims, it is "abundantly clear that there is a special risk of arbitrariness" in the prosecution of capital offenses. *Walker,* 555 U.S. at 980, 129 S.Ct. 453, 172 L.Ed.2d 344 (Stevens, J., statement respecting the denial of certiorari). In Ohio, as elsewhere, black defendants with white victims are far more likely to receive the death penalty than all other defendants facing capital charges. *See* Grosso, O'Brien & Roberts, *Local History, Practice, and Statistics: A Study on the Influence of Race on the Administration of Capital Punishment in Hamilton County, Ohio (January 1992-August 2017),* 51 Colum.Hum.Rts.L.Rev. 902, 931-932 (2020) (in cases in which the state seeks a death sentence, a black defendant in a case with at least one white victim is 5.33 times more likely to receive a death sentence). I believe we are statutorily and constitutionally required to undertake a more expansive proportionality review in cases such as this one that carry a special risk of arbitrariness.

{¶ 231} In this case, Graham fatally shot Nicholas Massa while Graham was helping his friend rob the friend's drug dealer. A criminal case involving a fatal shooting during a robbery is not uncommon. It is a sad reality, but it is a reality nonetheless. Even a cursory review of the most recent appeals involving a fatal shooting during the course of a robbery shows that the death penalty is not usually sought, let alone imposed, for this type of crime. *See State v. Cannon*, 9th Dist. Lorain No. 19CA011536, 2020-Ohio-3765; *State v. Rogenski*, 7th Dist. Columbiana No. 18 CO 0019, 2020-Ohio-1360; *State v. Smith*, 1st Dist. Hamilton No. C-180227, 2020-Ohio-649; *State v. Ocasio*, 5th Dist. Licking No. 2019 CA 00013, 2019-Ohio-5396; *State v. Mondie*, 8th Dist. Cuyahoga No. 108030, 2019-Ohio-5337; *State v. Johnston*, 10th Dist. Franklin No. 18AP-817, 2019-Ohio-5135; *State v. Hodge*, 10th Dist. Franklin No. 18AP-95, 2019-Ohio-4012; *State v. Hale*,

8th Dist. Cuyahoga No. 107646, 2019-Ohio-3276; *State v. Riggins*, 1st Dist. Hamilton No. C-180069, 2019-Ohio-3254; *State v. Howell*, 8th Dist. Cuyahoga No. 107545, 2019-Ohio-3182; *State v. Walker*, 2d Dist. Montgomery No. 28111, 2019-Ohio-3121; *State v. Johnson*, 8th Dist. Cuyahoga No. 107427, 2019-Ohio-2913; *State v. Snowden*, 2d Dist. Montgomery No. 27948, 2019-Ohio-2840; *State v. Brown*, 7th Dist. Columbiana No. 18 CO 0025, 2019-Ohio-2717; *State v. Burke*, 11th Dist. Trumbull Nos. 2018-T-0032 and 2018-T-0035, 2019-Ohio-1951.

{¶ 232} If "the infliction of a severe punishment is 'something different from that which is generally done' in such cases * * *, there is a substantial likelihood that the State, contrary to the requirements of regularity and fairness embodied in the [Cruel and Unusual Punishments] Clause, is inflicting the punishment arbitrarily." *Furman*, 408 U.S. at 276-277, 92 S.Ct. 2726, 33 L.Ed.2d 346 (Brennan, J., concurring), quoting *Trop v. Dulles*, 356 U.S. 86, 100, 78 S.Ct. 590, 2 L.Ed.2d 630 (1958), fn. 32. To impose capital punishment here, in light of the cases listed in the prior paragraph, would be arbitrary. Simply put, this should not be a death-penalty case.

{¶ 233} I want to emphasize that I have no pity for Graham, and I do not wish to downplay the unspeakable tragedy that befell Nicholas Massa and all those who loved him. A murder is an extreme and despicable act. It may end only one life but it ruins many others. An act of murder should not be taken lightly, and it deserves severe punishment. But the inquiry in a death-penalty proportionality review is not whether the murderer in the case should be punished but is instead whether the murder—among all other murders, which are also despicable and leave endless heartbreak in their wakes—is a murder for which the death penalty is appropriate. The death penalty must be reserved for only the worst among murder offenses. *See Roper v. Simmons,* 543 U.S. 551, 568, 125 S.Ct. 1183, 161 L.Ed.2d 1 (2005); *Atkins v. Virginia,* 536 U.S. 304, 319, 122 S.Ct. 2242, 153 L.Ed.2d 335

74

(2002). The murder in this case was cold, heartless, and senseless, but it is not the kind of murder offense for which the death penalty is appropriate.

{¶ 234} Accordingly, I would find merit in Graham's assertion that a proportionality review should include an evaluation of the sentence "in relation to [the sentences imposed for] other heinous crimes." Because the death penalty in this case would be disproportionate to the penalty found in similar cases, the death penalty should not have been imposed and I would vacate Graham's death sentence on this additional ground.

_____

**KENNEDY, J., concurring in judgment only in part and dissenting in part.**

{¶ 235} I concur in the majority's affirmance of appellant Damantae Graham's convictions. I write separately, however, to address the advisory opinion the majority issues purporting to resolve Graham's proposition of law No. VI. And I dissent from the majority's vacation of the death sentence. Contrary to the majority's determination, based on our precedent, the aggravating circumstances of aggravated robbery, aggravated burglary, and kidnapping do outweigh the mitigating factors in this case. And contrary to the concurrence's determination, a sentence of death in this case is proportionate to the penalty imposed in other aggravated-murder cases with the same aggravating circumstances. Therefore, I concur in the judgment in part and dissent in part.

{¶ 236} An 18-year-old victim, Nick Massa, died at the hands of a 19-year-old armed robber, Damantae Graham. Nick did not provoke Graham, did not attempt to flee, and did not incite the escalation of violence. Nick and the other victims of the armed robbery were compliant with the demands of the armed robbers, but Graham nevertheless cold-bloodedly killed Nick.

{¶ 237} Three robbers stormed into the apartment in which Nick was visiting with his friends. Two of the robbers were armed with .380-caliber High

Point semiautomatic handguns, and they had their guns drawn. The armed robbers ordered Nick to sit on the couch with his hands in the air, and Nick complied. The resident of the apartment gave the armed robbers everything they demanded. Graham told Nick not to look at the other victim who was sitting next to Nick on the couch or he would shoot him. In response Nick said, "You're not going to shoot me." Graham then pulled the trigger of his .380-caliber High Point and blew a hole in Nick's chest, killing him. When one of Graham's accomplices asked him why he did it, Graham said, "He thought sh[—] was sweet and I wasn't playing."

{¶ 238} During the guilt phase, which is sometimes referred to as "the trial phase," of Graham's trial, over defense counsel's objection, the trial court admitted the victim-impact testimony of Nick's father, Joe Massa ("Mr. Massa").

{¶ 239} At the beginning of the penalty phase of the death-penalty trial, the trial court instructed the jury:

> The State will address the aggravating circumstances of which [Graham] was found guilty and the Defense will address mitigating factors. In this case, the aggravating circumstances are precisely those set out in your verdict on Specifications Two, Three, Four to the first count of the indictment. They are also as follows:
>
> The offense was committed while [Graham] was committing, attempting to commit or fleeing immediately after committing or attempting to commit the offense of aggravated robbery and [Graham] was the principal offender in the commission of the offense; or the offense was committed while [Graham] was committing or attempting to commit or fleeing immediately after committing or attempting to commit the offense of aggravated burglary, and [Graham] was the principal offender in the commission of the offense; or the offense was committed while

76

[Graham] was committing or attempting to commit or fleeing immediately after committing or attempting to commit the offense of kidnapping, and [Graham] was the principal offender in the commission of the offense.

These aggravating circumstances were proven in the trial phase and it is not necessary for the [state] to present further evidence to you regarding these aggravating circumstances. However, only these aggravating circumstances may be considered by you during this sentencing proceeding.  * * *

* * *

* * * The aggravating circumstances will be weighed against the mitigating factors that have been or will be presented. Mitigating factors are factors about an individual or an offense that weigh in favor of a decision that a life sentence rather than a death sentence is appropriate.

{¶ 240} The trial court concluded the preliminary instructions to the jury by explaining the jury's role:

Again, you'll be deciding whether the [state] has proved beyond a reasonable doubt that the aggravating circumstances outweigh the mitigating factors.  If you find the aggravating circumstances outweigh the mitigating factors, then you must find that the death sentence be imposed upon [Graham].  However, if you find that the [state] did not prove beyond a reasonable doubt that the aggravating circumstances outweigh the mitigating factors, then you will enter a verdict imposing one of the life sentences * * *.

**{¶ 241}** During opening statements of the penalty phase, only defense counsel referred to Mr. Massa's victim-impact testimony, by contrasting Graham's childhood with Nick's:

> Ladies and gentleman, on February 7th of this year, two lives intersected and, tragically, one of those lives ended, and that was the life of Nicholas Massa. And you heard from Joe Massa, his dad, who got up on the stand and talked to you about the impact it's had on his family, the loss that he feels. The pride in his voice as he spoke about Nicholas['s] accomplishments.
>
> There was something else that you can get from what Joe Massa was saying. You could see how involved he was in his son's life. You can see how much effort he put into making sure that his son grew up right, and that's important for you to keep in mind.

**{¶ 242}** And during closing arguments, only defense counsel mentioned the presence of the Massa family in the courtroom and the pain that they feel for the loss of Nick's life.

> I know that [Nick's] family has been here throughout the entire trial and I know—no, I'm not gonna say that. I don't know the pain they're going through. I hope I never feel that pain. And it's tragic that they lost their son and your heart goes out to them.

**{¶ 243}** After the close of arguments, the trial court gave the jury further instructions:

The procedure that you must follow in arriving at your verdict in this phase of the trial is prescribed by law, and in this regard, you shall consider all of the testimony and evidence relevant to the aggravating circumstances [Graham] was found guilty of committing and mitigating factors raised at both phases of the trial, the statement of [Graham], the mental examination report and final arguments of counsel. You shall then decide whether the [state] proved beyond a reasonable doubt that the aggravating circumstances outweigh the mitigating factors present in this case.

\* \* \*

Some of the evidence and testimony that you considered in the trial phase of this case may not be considered in this sentencing phase.

For purposes of this proceeding, you are to consider only that evidence admitted in the trial phase that is relevant to the aggravating circumstances of which [Graham] has been found guilty and to any of the mitigating factors.

\* \* \* You will also consider all of the evidence admitted during the sentencing phase together with [Graham's] own statement.

{¶ 244} The trial court specifically excluded from the jury's consideration guilt-phase Exhibits 17, 21, and 23 and "any corresponding testimony." Guilt-phase Exhibit 23 was the photograph of Nick that was identified by Mr. Massa during his victim-impact testimony.

{¶ 245} Thereafter the trial court gave a final instruction:

You must not be influenced by any consideration of sympathy or prejudice. It is your duty to carefully weigh the evidence, to decide all disputed questions of fact, to apply the instructions of the court to your findings, and to render your verdict accordingly. In fulfilling your duty, your efforts must be to arrive at a just verdict. Consider all the evidence and make your findings with intelligence and impartiality, and without bias, sympathy or prejudice.

## I. Graham's Sixth Proposition of Law

### A. *The majority's response to Graham's sixth proposition of law is advisory*

{¶ 246} The majority casts Graham's sixth proposition of law as arguing that "the trial court erred by admitting victim-impact testimony during the guilt phase of the trial." Majority opinion at ¶ 104. But that is not what Graham argues in his sixth proposition of law.

{¶ 247} Proposition of law No. VI states, "Graham did not receive a fair trial due to the trial court permitting, over objection, an improper victim impact statement to the jury during guilt phase of the trial constituting prosecutorial misconduct." In support of his proposition of law Graham advances two arguments.

{¶ 248} Graham's first argument is that the trial court's "sole purpose" in overruling his objection to the testimony of Mr. Massa was to "cause prejudice, to intentionally violate [Evid.R.] 403." In support of that argument, Graham cites *State v. Gross*, 97 Ohio St. 121, 2002-Ohio-5524, 776 N.E.2d 1061, for the proposition that victim-impact testimony is admissible during the guilt phase of a death-penalty trial when the testimony concerns the circumstances surrounding the commission of the murder.

{¶ 249} Graham's second argument in support of his sixth proposition of law is that the prosecutor committed misconduct when he introduced Mr. Massa's victim-impact testimony during the guilt phase in order to "use emotion, rather than facts and law, to influence [the] jury" and thereby violated Graham's right to due process and a fair trial. Graham cites *State v. Thompson*, 33 Ohio St.3d 1, 15, 514 N.E.2d 407 (1987), to support his argument.

{¶ 250} By recasting Graham's proposition of law, the majority loses its way and issues an advisory opinion on whether Mr. Massa's victim-impact testimony was overly emotional. That issue—whether the victim-impact testimony of Mr. Massa was overly emotional—is not raised by Graham in proposition of law No. VI or advanced in his arguments in support of his proposition of law. Graham never cites or directs this court's attention to the watershed case regarding the admissibility of victim-impact testimony in a death-penalty case, *Payne v. Tennessee*, 501 U.S. 808, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991), or our case adopting the reasoning of *Payne*, *State v. Fautenberry*, 72 Ohio St.3d 435, 650 N.E.2d 878 (1995). Graham's only use of the word "emotion" in his argument in support of his sixth proposition of law is in relation to his argument that the prosecutor engaged in prosecutorial misconduct.

{¶ 251} Our longstanding policy is not to address an unbriefed issue. *State v. Quarterman*, 140 Ohio St.3d 464, 2014-Ohio-4034, 19 N.E.3d 900, ¶ 17, citing *State v. Carter,* 27 Ohio St.2d 135, 139, 272 N.E.2d 119 (1971). This practice also applies in death-penalty appeals. *E.g.*, *State v. Roberts*, 150 Ohio St.3d 47, 2017-Ohio-2998, 78 N.E.3d 851, ¶ 85; *see also State v. Sowell*, 148 Ohio St.3d 554, 2016-Ohio-8025, 71 N.E.3d 1034, ¶ 22 (capital case in which we ordered briefing on an issue not raised by the parties).

{¶ 252} The rationale for this policy is that " ' "appellate courts do not sit as self-directed boards of legal inquiry and research, but [preside] essentially as arbiters of legal questions presented and argued by the parties before them." ' "

(Brackets sic.)  *Quarterman* at ¶ 19, quoting *State v. Bodyke*, 126 Ohio St.3d 266, 2010-Ohio-2424, 933 N.E.2d 753, ¶ 78 (O'Donnell, J., concurring in part and dissenting in part), quoting *Carducci v. Regan*, 714 F.2d 171, 177 (D.C.Cir.1983).

{¶ 253} The process of judicial review depends on the parties to identify, preserve, and present issues for appeal.  *See Sizemore v. Smith,* 6 Ohio St.3d 330, 333, 453 N.E.2d 632 (1983), fn. 2, ("justice is far better served when [this court] has the benefit of briefing, arguing, and lower court consideration before making a final determination").  An appellate court is not obligated to conduct legal research or create arguments on behalf of the parties.  *Quarterman* at ¶ 19.  As Judge Richard Posner once put it, "we cannot write a party's brief, pronounce ourselves convinced by it, and so rule in the party's favor.  That's not how an adversarial system of adjudication works."  *Xue Juan Chen v. Holder*, 737 F.3d 1084, 1085 (7th Cir.2013).

{¶ 254} These concerns are even stronger in this case.  The majority constructs a novel test for determining whether testimony is overly emotional.  That new test will apply widely outside the confines of this case without the issue's ever having been subjected to adversarial briefing.  And given the overwhelming evidence establishing that Graham is guilty of the offenses and capital specifications of which he was convicted, it is striking to me that the majority feels compelled to abandon its role as a neutral arbitrator of questions that have been tested in the crucible of the adversarial process.  Courts " 'do not, or should not, sally forth each day looking for wrongs to right.  We wait for cases to come to us, and when they do we normally decide only questions presented by the parties.' " *Greenlaw v. United States*, 554 U.S. 237, 244, 128 S.Ct. 2559, 171 L.Ed.2d 399 (2008), quoting *United States v. Samuels*, 808 F.2d 1298, 1301 (8th Cir.1987) (Arnold, J., concurring in the denial of rehearing en banc).

{¶ 255} In fact, we have held that it is reversible error for a court of appeals to "decide cases on the basis of a new, unbriefed issue without 'giv[ing] the parties

notice of its intention and an opportunity to brief the issue.' " (Brackets sic.) *State v. Tate*, 140 Ohio St.3d 442, 2014-Ohio-3667, 19 N.E.3d 888, ¶ 21, quoting *State v. 1981 Dodge Ram Van,* 36 Ohio St.3d 168, 170, 522 N.E.2d 524 (1988). With the benefit of adversarial briefing, we may have received arguments and authority counselling against the adoption of today's test that the majority has failed to anticipate. Rather than deny the parties notice and an opportunity to be heard, this court should hold itself to the same standard that it holds other Ohio courts to, exercise a modicum of judicial restraint, and refrain from creating a new test for overly emotional evidence that no one has asked this court to adopt.

{¶ 256} And one can only ponder what Graham would have said in his own defense had he been given the opportunity. Would he have asserted that there were matters outside the record, such as unrecorded signs of emotion by Mr. Massa or the jurors, that the court should consider? We will never know.

{¶ 257} In reaching its decision, the majority "answers a question that is not necessary to resolve this case and is, therefore, dicta or advisory." *State v. Mohamed*, 151 Ohio St.3d 320, 2017-Ohio-7468, 88 N.E.3d 935, ¶ 32 (Fischer, J., concurring). And " '[t]he problem with dicta, and a good reason that it should not have the force of precedent for later cases, is that when a holding is unnecessary to the outcome of a case, it may be made with less care and thoroughness than if it were crucial to the outcome.' " *Bodyke*, 126 Ohio St.3d 266, 2010-Ohio-2424, 933 N.E.2d 753, at ¶ 89 (O'Donnell, J., concurring in part and dissenting in part), quoting *Bauer v. Garden City*, 163 Mich.App. 562, 571, 414 N.W.2d 891 (1987).

*B. The admission of Mr. Massa's victim-impact testimony was not the result of prosecutorial misconduct*

{¶ 258} Because Graham's second argument in support of proposition of law No. VI is easily dispensed with, I begin with it.

{¶ 259} Prosecutorial misconduct results from an improper action or inaction of the prosecutor. *See State v. Thompson*, 141 Ohio St.3d 254, 284, 2014-

Ohio-4751, 23 N.E.3d 1096, ¶ 162 (to evaluate allegations of prosecutorial misconduct a reviewing court must determine whether the prosecutor's conduct was improper). *Thompson*, 33 Ohio St.3d 1, 514 N.E.2d 407, illustrates the distinction perfectly. In *Thompson*, the prosecutor, during closing arguments of the guilt phase of a death-penalty trial, commented on three separate occasions about the defendant's refusal to testify on his own behalf. *Id.* at 3.

{¶ 260} In this case, the prosecutor intended to call Mr. Massa as a witness during the guilt phase of the death-penalty trial. Graham objected to the testimony, and the trial court denied the objection and permitted Mr. Massa to testify. The prosecutor had no control over the determination whether to permit the testimony of Mr. Massa. That decision was within the sole province of the trial court. *See Calderon v. Sharkey*, 70 Ohio St.2d 218, 436 N.E.2d 1008 (1982) (the determination of the admissibility of evidence relating to a medical expert's bias and pecuniary interest is within the sound discretion of the trial court).

{¶ 261} I turn now to Graham's first argument in support of his sixth proposition of law—whether the trial court erred in admitting the victim-impact testimony of Mr. Massa during the guilt phase of the death-penalty trial and if so, whether that error affected Graham's substantial rights.

C. *The trial court committed harmless error in admitting Mr. Massa's victim-impact testimony during the guilt phase of the death-penalty trial*

{¶ 262} Evidence must be relevant to be admissible. Evid.R. 402. Evid.R. 403(A) prohibits the admission of relevant evidence if its "probative value is substantially outweighed by the danger of unfair prejudice, of confusion of the issues, or of misleading the jury." Exclusion of such evidence is mandatory. In *Gross*, this court held that victim-impact testimony is relevant and admissible during the guilt phase of a death-penalty trial when the testimony concerns the circumstances surrounding the commission of the murder. *Id.*, 97 Ohio St.3d 121, 2002-Ohio-5524, 776 N.E.2d 1061, at ¶ 62.

**{¶ 263}** Because Graham objected to the admission of Mr. Massa's testimony during the guilt phase, the harmless-error standard applies. *See State v. Perry*, 101 Ohio St.3d 118, 2004-Ohio-297, 802 N.E.2d 643, ¶ 15 (if a defendant has objected to an error in the trial court, an appellate court reviews the error under the "harmless error" standard in Crim.R. 52(A)). In *State v. Morris*, this court adopted a new harmless-error test for instances when the erroneous admission of evidence during a defendant's trial affected his or her nonconstitutional rights. *Id.*, 141 Ohio St.3d 399, 2014-Ohio-5052, 24 N.E.3d 1153. Such error is deemed harmless under Crim.R. 52(A) if the state demonstrates that the erroneous admission was harmless beyond a reasonable doubt and that the error did not contribute to the defendant's conviction. *Id.* at ¶ 28-30. While I adhere to the views expressed in my dissent in *Morris* and continue to believe that *Morris* was wrongly decided, it remains binding precedent as to the standard of review that applies in determining whether the erroneous admission of evidence was harmless.

**{¶ 264}** I agree with the majority that Mr. Massa's victim-impact testimony did not concern the circumstances surrounding the commission of the murder and that the trial court erred in admitting his victim-impact testimony during the guilt phase of the death-penalty trial. But that determination does not end the inquiry. It is only when the error prejudiced the defendant that a new trial is warranted. In this case, because "[t]he remaining evidence properly admitted at trial established Graham's guilt beyond a reasonable doubt," majority opinion at ¶ 134, the trial court's error was harmless.

**{¶ 265}** Because there is no evidence of prosecutorial misconduct and the trial court's error in admitting Mr. Massa's victim-impact testimony during the guilt phase of the death-penalty trial was harmless, the majority properly rejects Graham's proposition of law No. VI.

**{¶ 266}** Therefore, I concur in the portion of the judgment affirming Graham's convictions.

### D. Carryover effect

{¶ 267} Graham does not argue in his sixth proposition of law, or in any other proposition of law, that there was prejudicial carryover effect from the admission of Mr. Massa's victim-impact testimony in the guilt phase of the death-penalty trial to the penalty phase. And the better course is for courts not to sua sponte raise and address unbriefed issues "not only out of respect for the adversarial process but also because it leads to better decision-making." *Turner v. CertainTeed Corp.*, 155 Ohio St.3d 149, 2018-Ohio-3869, 119 N.E.3d 1260, ¶ 80 (DeWine, J., concurring in judgment only). And even though judicial restraint counsels against addressing this unbriefed issue, the majority nevertheless tackles it, despite having already determined that Mr. Massa's testimony was not overly emotional and therefore not prejudicial.

{¶ 268} That decision by the majority—to grapple with this issue—results in its sidestepping what the trial court actually did in preserving Graham's right to a fair trial during the penalty phase. Also, by fashioning the issue for itself, the majority allows Graham's invited error to vanish from sight.

{¶ 269} The trial court's preliminary penalty-phase jury instructions explained to the jury its task: weighing the aggravating circumstances, proved by the state in the guilt phase, against any mitigating factors that had been presented in the guilt phase or that would be presented during the penalty phase. After closing arguments in the penalty phase, the trial court told the jury to "consider all of the testimony and evidence *relevant* to the aggravating circumstances * * * and mitigating factors raised at both phases of the trial, the statement of [Graham], the mental examination report and final arguments of counsel." (Emphasis added.) In the trial court's directive to the jury the court reiterated that the jury could "consider only *that evidence admitted in the trial phase that is relevant* to the aggravating circumstances of which [Graham] has been found guilty and to any of the mitigating factors." (Emphasis added.) The jury was informed: "[T]he aggravating

circumstances are precisely those set out in your verdict on Specifications Two, Three, Four to the first count of the indictment." The trial court then defined "mitigating factors" as "factors about an individual or an offense that weigh in favor of a decision that a life sentence rather than a death sentence is appropriate." The trial court then specifically excluded certain guilt-phase evidence from the jury's consideration during the penalty phase—relevant here, Exhibit 23, the photograph of Nick that Mr. Massa identified during his testimony—and any of the testimony corresponding to that evidence.

{¶ 270} Mr. Massa's victim-impact testimony was not relevant evidence to either the aggravating circumstances or the mitigating factors, and the trial court specifically excluded it from the jury's consideration. And to further ensure that the jurors did not allow any other considerations to influence their penalty-phase deliberative process, the trial court instructed the jury that it "must not be influenced by any consideration of sympathy or prejudice." Rather, the jury was told, "[c]onsider all the evidence and make your findings with intelligence and impartiality, and without bias, sympathy or prejudice." This court has long recognized that "[a] jury is presumed to follow the instructions given to it by the trial judge." *State v. Clinton,* 153 Ohio St.3d 422, 2017-Ohio-9423, 108 N.E.3d 1, ¶ 52; *accord Weeks v. Angelone*, 528 U.S. 225, 234, 120 S.Ct. 727, 145 L.Ed.2d 727 (2000) ("A jury is presumed to follow its instructions"); *State v. Garner*, 74 Ohio St.3d 49, 59, 656 N.E.2d 623 (1995) (jury is presumed to follow curative instructions given it by a trial judge in a death-penalty case). And nothing in the record before this court rebuts that presumption.

{¶ 271} Lastly, although the majority does not address it—if there was any error during the penalty phase regarding Mr. Massa's victim-impact testimony—it was invited by Graham, an error which he cannot now benefit from. Only defense counsel discussed Mr. Massa's victim-impact testimony during opening statements, reminding the jurors that it was "important for [them] to keep in mind" "how much

effort [Mr. Massa] put into making sure that his son grew up right." And during closing arguments, only defense counsel mentioned the presence of the Massa family in the courtroom and the pain they must feel over the loss of their son.

**{¶ 272}** This court has recognized that a defendant may not " 'take advantage of an error which he himself invited or induced.' " *Sowell*, 148 Ohio St.3d 554, 2016-Ohio-8025, 71 N.E.3d 1034, at ¶ 50, quoting *Hal Artz Lincoln-Mercury, Inc. v. Ford Motor Co., Lincoln-Mercury Div.*, 28 Ohio St.3d 20, 502 N.E.2d 590 (1986), paragraph one of the syllabus. And we recently applied this principle in *State v. Grate*, ___ Ohio St.3d ___, 2020-Ohio-5584, ___ N.E.3d ___ ¶ 197, holding that the accused invited any error in replacing a juror when defense counsel moved to excuse the juror.

**{¶ 273}** Because Graham did not argue prejudicial carryover effect of Mr. Massa's victim-impact testimony from the guilt phase to the penalty phase, I would not address the issue; I address the issue here only because the majority does. If the jurors considered Mr. Massa's testimony in the penalty phase, that error was invited by Graham. Moreover, if there was any error, I agree with the majority that Graham was not prejudiced by it.

## II. Independent Sentence Review

**{¶ 274}** When this court is considering a case involving the imposition of capital punishment, R.C. 2929.05(A) requires that we

> review and independently weigh all of the facts and other evidence disclosed in the record in the case and consider the offense and the offender to determine whether the aggravating circumstances the offender was found guilty of committing outweigh the mitigating factors in the case, and whether the sentence of death is appropriate.

**{¶ 275}** To determine whether the sentence of death is appropriate, the statute directs the court to "consider whether the sentence is excessive or disproportionate to the penalty imposed in similar cases." *Id*. It also requires that this court

> review all of the facts and other evidence to determine if the evidence supports the finding of the aggravating circumstances the trial jury * * * found the offender guilty of committing, and * * * determine whether the sentencing court properly weighed the aggravating circumstances the offender was found guilty of committing and the mitigating factors.

*Id*.

**{¶ 276}** The majority here overrides the jury's verdict and the trial court's independent finding that the aggravating circumstances outweighed the mitigating factors beyond a reasonable doubt. The majority affords great weight to insubstantial and unsubstantiated testimony from Graham's mitigation witness, and in the process, sets a new low bar for death-penalty defendants to overcome. Graham was a bright young man who had a rocky childhood and a self-described but unproved addiction to Xanax. He was not thrust by his circumstances onto an unchangeable course that led to aggravated murder. The aggravating circumstances heavily outweigh the mitigating factors in this case.

### A. Aggravating circumstances

**{¶ 277}** I agree with the majority that the evidence at trial supports the jury's findings of guilt as to the three aggravating circumstances—aggravated robbery, aggravated burglary, and kidnapping.

*B. Mitigating factors*

**{¶ 278}** Against these aggravating circumstances, we are to weigh the following mitigating factors set forth in R.C. 2929.04(B):

- the nature and circumstances of the offense,

- the history, character, and background of the offender,

- whether the victim induced or facilitated the offense, R.C. 2929.04(B)(1),

- whether it is unlikely that the offense would have been committed but for the offender's being under duress, coercion, or strong provocation, R.C. 2929.04(B)(2),

- whether at the time of committing the offense the offender, because of a mental disease or defect, lacked substantial capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law, R.C. 2929.04(B)(3),

- the youth of the offender, R.C. 2929.04(B)(4),

- the offender's lack of a significant history of prior criminal convictions and delinquency adjudications, R.C. 2929.04(B)(5),

- if the offender participated in the offense but was not the principal offender, the degree of his participation in the offense and in the acts that led to the victim's death, R.C. 2929.04(B)(6),

- and any other factors relevant to the issue whether the offender should be sentenced to death, R.C. 2929.04(B)(7).

**{¶ 279}** The majority concludes that only the following mitigating factors deserve weight in this case: (1) Graham's background, (2) his age at the time of the offense—19, and (3) the catchall provision for other relevant factors, i.e., Graham (a) suffered mental-health and substance-abuse issues, (b) had adjusted well to prison life, and (c) made an unsworn expression of remorse, *see State v. Kirkland*, 140 Ohio St.3d 73, 2014-Ohio-1966, 15 N.E.3d 818, ¶ 158, 160-161 (history of

drug and alcohol abuse and unsworn expressions of remorse considered); *State v. Jones*, 135 Ohio St.3d 10, 2012-Ohio-5677, 984 N.E.2d 948, ¶ 261 (history of mental-health problems considered).

### C. *Weighing of aggravating circumstances and mitigating factors*

{¶ 280} The majority recognizes that the nature and the circumstances of the offense and the mitigating factors set forth in R.C. 2929.04(B)(1), (2), (3), (5), and (6) fail to offer anything in mitigation. Nevertheless, the majority finds that it "cannot conclude that the aggravating circumstances that Graham was found guilty of committing outweigh the mitigating factors present in the case beyond a reasonable doubt," majority opinion at ¶ 216.

{¶ 281} In reaching this conclusion, the majority elevates age to an almost all-consuming factor, improperly considers Graham's alleged addiction to Xanax and abuse of Adderall, overstates the difficulty of Graham's childhood, and ignores established precedent. When the mitigation factors that are supported by credible evidence are considered, and when the evidence is not distorted and is regarded in the context of our precedent, the obvious conclusion is that the aggravating circumstances outweigh the mitigating factors in this case.

### 1. Youth

{¶ 282} After recognizing that this court has upheld death sentences for defendants who were 19 years old at the time of their crimes, the majority explains that there have been "developments in the case law on the weight to be given to the mitigating factors of youth and mental-health issues." Majority opinion at ¶ 214. But the majority neglects to explain what those developments are. It is possible that the majority is referring to the categorical ban of the death penalty for defendants under the age of 18 set forth in *Roper v. Simmons*, 543 U.S. 551, 578, 161 L.Ed.2d 1, 125 S.Ct. 1183 (2005), but that ban does not apply to defendants who committed their crimes after they turned 18 years old. In *Graham v. Florida*, 560 U.S. 48, 74-75, 130 S.Ct. 2011, 176 L.Ed.2d 825 (2010), the court prohibited

the imposition of a life-without-parole sentence on a juvenile offender who committed a crime other than a homicide. The court explained that under the Constitution, juveniles should be treated differently from adults for purposes of punishment. But again, Graham was not a juvenile when he murdered Nick. Or perhaps the majority considers the developments in the law to be the assignment of "significant weight" to the factor of youth in two previous cases from this court. *See State v. Lang*, 129 Ohio St.3d 512, 2011-Ohio-4215, 954 N.E.2d 596, ¶ 337 (offender's youth at time of offense, age 19, accorded significant weight); *State v. Pickens,* 141 Ohio St.3d 462, 2014-Ohio-5445, 25 N.E.3d 1023, ¶ 252 (offender's youth at time of offense, age 19, accorded significant weight), *overruled in part on other grounds, State v. Bates*, 159 Ohio St.3d 156, 2020-Ohio-634, 149 N.E.3d 475, ¶ 35.

{¶ 283} However, in assigning "significant weight" to the offenders' youth in *Lang* and *Pickens,* this court did not expound upon its reasoning for so doing. Instead, the court made perfunctory statements. From this, it is disingenuous to find that there have been developments in our case law with respect to how the mitigating factor of youth is to be considered. This is particularly true given that in both cases, after giving significant weight to the factor of youth, the court stressed that it had upheld the death penalty in cases in which the defendant committed aggravated murder at Lang's and Pickens's age or younger. *Lang* at ¶ 337; *Pickens* at ¶ 252. And in both *Lang* and *Pickens*, this court upheld the death sentences. *Lang* at ¶ 342; *Pickens* at ¶ 258.

{¶ 284} Also, *State v. Johnson*, 144 Ohio St.3d 518, 2015-Ohio-4903, 45 N.E.3d 208, counters any argument that after *Lang* and *Pickens*, this court has always assigned the factor of youth significant weight. In *Johnson*, the offender was 19 years old at the time of the aggravated murder. Despite the recent "significant weight" assigned to the factor of youth in *Lang* and *Pickens*, the

*Johnson* court assigned "some weight" to Johnson's youth. *Id.* at ¶ 133. And, again, the court did so without offering any discussion of its reasoning.

{¶ 285} Contrary to the majority's assertion, there have been no developments in the law on the weight of the mitigating factor of youth in young adults. Rather, we give some degree of weight to youth because it is a mitigating factor under R.C. 2929.04(B)(4) and because 18 is the minimum age for death-penalty eligibility, *see, e.g.*, *State v. Franklin*, 97 Ohio St.3d 1, 2002-Ohio-5304, 776 N.E.2d 26, ¶ 98; *see also State v. Hill*, 64 Ohio St.3d 313, 335, 595 N.E.2d 884 (1992).

{¶ 286} Accordingly, I would give some weight to Graham's youth.

### 2. Mental health and substance abuse

{¶ 287} The majority also asserts that there have been recent developments with respect to the weight to be given to the mitigating factor of mental health. Again, this sweeping statement is unsupported by analysis or authority. However, our capital-case jurisprudence reveals that the majority's position is without support.

{¶ 288} We have consistently accorded some weight to mental-health issues that are considered under R.C. 2929.04(B)(7). *See State v. Froman*, __ Ohio St.3d __, 2020-Ohio-4523, __ N.E.3d __, ¶ 182 (some weight given to the evidence of the offender's depression); *Johnson*, 144 Ohio St.3d 518, 2015-Ohio-4903, 45 N.E.3d 208, at ¶ 134 (some weight given to the evidence of the offender's mental illness and addiction); *Lang*, 129 Ohio St.3d 512, 2011-Ohio-4215, 954 N.E.2d 596, at ¶ 336 (some weight given to the fact that the offender suffered from depression). And we have also considered whether there is a significant connection between the offender's mental illness and the murder. *Id.*

{¶ 289} Graham's expert witness, Dr. Thomas Swales, testified that Graham did not have a major depressive disorder, schizophrenia, bipolar disorder, or a schizoafffective disorder, i.e., he did not have a "serious mental illness" as the

expert understood the term. Graham did have behavioral problems and had been diagnosed with oppositional defiant disorder when he was 12 years old. He received treatment for that disorder, seven sessions with a counselor, which his mother made sure he attended.

{¶ 290} Dr. Swales testified that the "worst" of Graham's problems was an addiction to Xanax. I disagree with the majority's determination that Graham's alleged addiction to Xanax, and his use of it in combination with Adderall, is a mitigating factor. Graham's alleged addiction is based on Dr. Swales's testimony. However, Dr. Swales's testimony is not credible evidence.

{¶ 291} Dr. Swales acknowledged that "anybody could say, well, I have a drug abuse problem." "So," he said, "that's why you try to investigate the background, the history, interview relatives, look at all the records and see if there's any other evidence." However, as Dr. Swales admitted, there is no corroboration for Graham's self-reported alleged Xanax addiction and abuse of Adderall. None of the family members who Dr. Swales interviewed indicated that Graham abused Xanax or Adderall, let alone that he was addicted to Xanax. While Graham's mother confirmed that Graham began using cannabis at 15, she was unaware of any other drug abuse. His juvenile-court records and medical records also indicate his use of cannabis, but there is no mention of Graham's using or abusing Xanax or Adderall in those records. And Dr. Swales saw no evidence that Graham had ever tested positive for Xanax or that any therapist had ever detected a Xanax addiction.

{¶ 292} Additionally, Dr. Swales testified that Graham stated that he was using a high amount—one to one-and-a-half bars—of Xanax daily. Dr. Swales opined that taking "such large quantities" of Xanax would result in "aggression, irritability, sleep difficulties, [and] tremors." He also stated that "using high amounts of Xanax * * * leads you to act without thinking. And this * * * can lead to aggressive behavior."

{¶ 293} However, additional testimony by Dr. Swales undermines the credibility of these statements. He acknowledged that he did not know how many milligrams a bar of Xanax contains or "the actual potency of the drug," since Graham had obtained the bars on the street. But Dr. Swales also acknowledged the limits of his knowledge, stating that he is "not a prescriber in the state of Ohio" and that he is unaware of the therapeutic dosages of Xanax to treat conditions for which it is generally prescribed, such as anxiety, panic disorders, and insomnia.

{¶ 294} Dr. Swales's testimony does not support finding (1) that Graham was abusing Xanax or (2) that Graham was consuming a high amount of Xanax. Accordingly, Graham's alleged addiction to Xanax cannot be considered as a mitigating factor under R.C. 2929.04(B)(7). *See State v. Spivey*, 81 Ohio St.3d 405, 428, 692 N.E.2d 151 (1998) (existence of R.C. 2929.04(B)(3) mitigating factor not established by a preponderance of the evidence because, inter alia, there was no credible evidence that appellant acted uncontrollably at the time of the murder).

{¶ 295} Graham, however, was diagnosed with cannabis dependence in 2013. He used marijuana every day, starting at around age 15. According to Dr. Swales, Graham never received drug treatment.

{¶ 296} Based on the foregoing, I do not find the evidence of Graham's addiction to Xanax or his use of Xanax in combination with Adderall to be credible. I also am compelled to note, because the majority does not, that even though voluntary intoxication is not a strong mitigating factor, we have accorded some weight to drug addiction. *State v. Tibbetts*, 92 Ohio St.3d 146, 174, 749 N.E.2d 226 (2001).

{¶ 297} Therefore, I would assign some weight to Graham's mental-health issues and marijuana dependence.

### 3. History and background

{¶ 298} The majority finds the evidence regarding Graham's "troubled upbringing" and "unstable home environment" to be "strong and compelling

mitigation evidence." Majority opinion at ¶ 208, 206. While Graham's childhood and home life may not have been ideal, the majority mischaracterizes the evidence and fails to consider the evidence in its entirety. Moreover, it fails to compare Graham's upbringing to those of defendants in cases in which we found the defendant's background to be a mitigating factor.

{¶ 299} Graham's father was absent from his life, but his mother and grandmother were not. And the evidence shows that Graham's mother was actively involved in his upbringing. She sought help when Graham repeatedly ran away, took him to counseling sessions, and kept him in school until Graham dropped out after the 11th grade.

{¶ 300} While there were times when Graham's family had to live with his grandmother, he was never homeless. Additionally, Dr. Swales had the opportunity to visit the mother's house. While it was located in a housing project, Dr. Swales described it as "very neat and clean, pretty nice."

{¶ 301} Graham was the recipient of corporal punishment with a belt, but not so hard as to leave marks, and the family was never involved with child-protective services. Indeed, Dr. Swales opined that the fact that Graham was disciplined with a belt by this mother did not characterize him as an abused child.

{¶ 302} Also important are Graham's educational achievements. Dr. Swales reviewed his transcripts and testified that in the 11th grade, Graham was "an A student in English, algebra, environmental sciences, American government, physical education, art, positive life skills and technology, [and he received] a B in health and C in business employability." And although he did drop out of school before graduation, "he passed all of his Ohio graduation test requirements and was advanced [in] math, accelerated in reading, proficient in writing, science and social studies." Dr. Swales testified that he had given Graham an IQ test and he scored a 99, which would be that of a "typical kid," according to Swales.

{¶ 303} The majority's position is not supported by our precedent. We have recognized that a defendant's "childhood suffering is relevant, but only to the extent his 'criminal * * * acts are attributable to' it." (Ellipsis sic.) *State v. Campbell*, 95 Ohio St.3d 48, 53, 765 N.E.2d 334 (2002), quoting *California v. Brown*, 479 U.S. 538, 545, 107 S.Ct. 837, 93 L.Ed.2d 934 (1987) (O'Connor, J., concurring). Without this connection, a defendant's childhood experience should be accorded minimal weight in mitigation. *See Campbell* at 51-54; *State v. Madison*, 160 Ohio St.3d 232, 2020-Ohio-3735, 155 N.E.3d 867, ¶ 241 ("this court has seldom given strong weight to a defendant's unstable or troubled childhood"); *State v. Kirkland*, 160 Ohio St.3d 389, 2020-Ohio-4079, 157 N.E.3d 716, ¶ 174 ("we have seldom ascribed much weight in mitigation to a defendant's unstable or troubled childhood").

{¶ 304} Graham's childhood is far from the bleak portrayal depicted by the majority. And perhaps most importantly, the majority never connects Graham's upbringing to the offenses he committed in this case. Therefore, I would find that Graham's history and background is entitled to minimal weight.

### 4. This court's prior weighing of factors in comparable cases

{¶ 305} The majority acknowledges that in both *Spivey*, 81 Ohio St.3d 405, 692 N.E.2d 151, and *State v. Raglin*, 83 Ohio St.3d 253, 699 N.E.2d 482 (1998), we upheld the death sentence when "the offender was 19 or younger, had mental-health and substance-abuse issues, and had an unstable home life." Majority opinion at ¶ 214. However, without any substantive analysis, the majority dismisses both by stating that they "are distinguishable given developments in the case law on the weight to be given to the mitigating factors of youth and mental-health issues." Majority opinion at ¶ 214. The majority, however, provides no support for these broad, sweeping statements. Because it can't.

{¶ 306} Examining *Spivey* and *Raglin*, and a third case, *State v. Stallings*, 89 Ohio St.3d 280, 731 N.E.2d 159 (2000), reveals that they are more analogous

to, than distinguishable from, this case. And in each of those cases, this court upheld the death penalty.

{¶ 307} In *Spivey*, Warren Spivey broke into Veda Eileen Vesper's residence, attacked her, stabbed her multiple times, and beat her to death. *Id.* at 405. He also robbed her of jewelry and other personal property and fled in her automobile. *Id.*

{¶ 308} We found that the state had proved one aggravating circumstance—aggravated robbery or aggravated burglary—beyond a reasonable doubt. *Id.*, 81 Ohio St.3d at 420, 692 N.E.2d 151, fn. 2. The *Spivey* court found the nature and circumstances of the offense revealed nothing of mitigating value. *Id.* at 424. The only applicable mitigating factors were the offender's youth (age 19 at the time of the offense), history and background, and psychological problems (attention-deficit disorder, alcohol and marijuana abuse/possible dependency, borderline personality disorder with schizoid and antisocial features). *Id.* at 422, 424, 428.

{¶ 309} We characterized Spivey's childhood as "very difficult and troubled." *Id.* at 424. During his childhood, he was treated as an outcast by his family members. *Id.* Spivey suffered convulsions as a toddler. *Id.* at 420. His mother felt resentment toward him because she felt "he was interfering with her life because of his various medical and behavioral problems." *Id.* at 420. She eventually "stopped seeking medical care and treatment for [Spivey's] convulsions and, as he matured, his seizures began to manifest themselves in forms of rage and anger." *Id.*

{¶ 310} During Spivey's childhood, his mother "told him that she hated him and wished that he had never been born." *Id.* Her resentment of Spivey led her to verbally and physically abuse him. *Id.* He was also physically abused by his father. *Id.* And on at least one occasion, Spivey was sexually assaulted by his cousin's uncle. *Id.* at 421.

{¶ 311} His mother did little to address the constant trouble Spivey got into at home and school. *Id.*, 81 Ohio St.3d at 420, 692 N.E.2d 151. The family failed to follow through on professional recommendations for Spivey's treatment, which included medication, further evaluation, and family counseling. *Id.* at 421.

{¶ 312} Spivey also suffered from physical and mental problems or deficiencies. *Id.* at 424. As a child, he was diagnosed with XYY Syndrome, a genetic chromosome abnormality. *Id.* at 421. A few aspects of XYY Syndrome are increased risk of behavioral problems, mental disease, and committing criminal acts. *Id.* at 422. One expert testified that Spivey also suffered from " '[c]onduct disorder, unsocialized, nonaggressive,' '[d]evelopmental language disorder, receptive type,' and '[a]ttention deficit disorder without hyperactivity.' " *Id.* at 422. Another expert diagnosed Spivey "as suffering from * * * 'alcohol and marijuana abuse, possible dependency,' and a 'borderline personality disorder with schizoid and anti-social features.' " *Id.*

{¶ 313} We found that each of the mitigating factors were entitled to some weight in mitigation. *Id.* at 424. However, when the court weighed the aggravating circumstance against the evidence presented in mitigation, we determined that the aggravating circumstance outweighed the mitigating factors beyond a reasonable doubt. *Id.* at 429. We affirmed his sentence of death. *Id.*

{¶ 314} We reached the same conclusion in *Raglin*, 83 Ohio St.3d 253, 699 N.E.2d 482. Walter Raglin was looking for someone to rob when he saw Michael Bany, a musician who was leaving an engagement, and approached him from behind in a parking lot. *Id.* at 253-254. Raglin pulled out a pistol and demanded money; Bany gave him $60. *Id.* at 254. Raglin then asked whether Bany's vehicle had an automatic or manual transmission, and when Bany failed to answer and turned toward Raglin, Raglin shot him in the side of the neck, killing him. *Id.*

{¶ 315} We held that the state proved the aggravating circumstance of aggravated robbery beyond a reasonable doubt. *Id.* at 266-267. The nature and

circumstances of the offense revealed nothing of mitigating value. *Id.* at 273. The applicable mitigating factors were Raglin's history and background, his youth (age 18 at the time of the offense), his expressions of remorse and sorrow, and his cooperation with police and the fact that Raglin may have, due to a mental disease or defect, lacked the capacity to conform his conduct to the requirements of the law. *Id.* at 272-273.

{¶ 316} We found that Raglin "lacked appropriate parental support and guidance, his family life was chaotic, the conduct of his mother was reprehensible, and the resulting situations [he] was subjected to during his formative years [were] nothing short of atrocious." *Id.* at 272. His father was incarcerated on several occasions for drug-related offenses. *Id.* at 267. His mother spent some nights in jail for prostitution and often abandoned him and his siblings for days or a week at a time while she was "running the streets and getting high." *Id.* When Raglin was approximately nine years of age, his mother allowed him to drink alcohol and smoke cigarettes and she directed him to steal money to support her drug habit. *Id.* She used her monthly government-assistance checks to purchase drugs. *Id.* at 268. As a preteen, Raglin accompanied his mother to drug deals as a form of protection for her. *Id.*

{¶ 317} His family moved from place to place during his childhood, and his living conditions were deplorable. *Id.*, 83 Ohio St.3d at 267, 699 N.E.2d 482. "The homes were characterized by extreme filth and inadequate facilities. Some of the places were infested with mice and insects." *Id.* At one point, he lived with his mother and some of his siblings in tack rooms near the horse stables at a racetrack where his mother's boyfriend worked. *Id.* The tack rooms were very small and lacked a kitchen, electricity, plumbing, and privacy. *Id.*

{¶ 318} Raglin's sister recounted childhood instances in which he "had engaged in self-destructive behavior, including jumping out of windows, putting firecrackers in his shoes, and shooting himself in the leg." *Id.* at 268. He spent

time in several juvenile facilities and at one point, underwent psychiatric evaluation. *Id.*

{¶ 319} During the penalty phase, appellant gave an unsworn statement. He repeatedly expressed sorrow for the pain and grief he had caused to Bany's family, to society, and to his own family. *Id.* at 269. He also stated, "[K]nowing that I took a person's life * * * haunts me every second and every minute of my life. It's going to be with me forever." *Id.* He expressed his belief that he deserved a life sentence and not the death penalty. *Id.*

{¶ 320} An expert testified that "the results of [Raglin's] psychological testing were consistent with the profile of a person who lacks a well-developed sense of self, who is prone to 'problems with impulse control and his thinking that are greatly in excess of those that other people experience,' and who has 'real difficulties with his mood.' " *Id.*, 83 Ohio St.3d at 270, 699 N.E.2d 482. The expert diagnosed Raglin as "suffering from adjustment disorder with depressed mood, cognitive disorder, alcohol-related disorder, cannabis-related disorder, borderline personality disorder, and antisocial personality disorder." *Id.*

{¶ 321} We found that Raglin's childhood, history, and family background were entitled to some meaningful weight in mitigation. *Id.* at 272. The factor of youth was assigned some weight in mitigation. *Id.* at 273. Raglin's various psychological conditions were given limited weight. *Id.* And his cooperation with police and expressions of remorse and sorrow were assigned "some, but very little, weight in mitigation." *Id.*

{¶ 322} We recognized that the *combined* mitigating factors in *Raglin* were *stronger than the typical mitigation* presented in death-penalty cases. *Id.* at 274. Nonetheless, we concluded that the mitigating factors were "*heavily counterbalanced*" by the aggravating circumstance that Raglin was found guilty of committing. (Emphasis added). *Id.*

{¶ 323} In *Stallings*, Michael Stallings, along with a gang accomplice, sought to rob Eric Beverly, a reputed local marijuana dealer. *Id.*, 89 Ohio St.3d 280, 731 N.E.2d 159. Stallings entered the apartment of Beverly's girlfriend and demanded money and marijuana from Beverly. *Id.* He then shot 16-year-old Rolisha Shephard, while she was holding her 14-month-old son. *Id.* at 280-281.

{¶ 324} The state proved two aggravating circumstances—aggravated robbery and aggravated burglary—beyond a reasonable doubt. *Id*. at 300. This court found that the nature and circumstances of the offense revealed nothing of mitigating value. *Id.* The applicable mitigating factors were Stallings's youth (age 20 at the time of the offense), history and background, psychological problems (attention-deficit/hyperactivity disorder ("ADHD")), expressions of remorse, adjustment to prison life, and cooperation with police. *Id.*

{¶ 325} Stallings's cousin testified that Stallings had had a difficult childhood. She said he was raised in " 'the projects' " by a mother who did not work and was neglectful of Stallings and his siblings. *Id.* at 298. The " 'kids were filthy from head to toe' and half-starving most of the time." *Id.* They relied on friends for clothing. *Id.* Stallings did, however, have an aunt he was very close to, who looked after him when she could. *Id.*

{¶ 326} The jail chaplain testified that Stallings had shown " 'a great deal of remorse' about what happened to Shephard and the fact that her son will be raised without a mother." *Id.*, 89 Ohio St.3d at 298-299, 731 N.E.2d 159. He noted that Stallings "participates in Bible study" and visits with clergy. *Id.* at 299. He expressed the opinion that Stallings "would be able to lead a useful life in prison if his life [was] spared." *Id.*

{¶ 327} The investigating detective agreed that Stallings had cooperated and admitted his involvement in the offense when he was questioned. *Id.* He recounted that Stallings cried during his confession and said "he could not sleep

and would 'wake up in the middle of the night[,] reliving the incident and * * * screaming.' " (Brackets and ellipsis sic.) *Id.*

{¶ 328} Childhood medical reports revealed that Stallings "suffered from 'mild mental retardation' and some 'psychotic-like symptoms,' " and "described him as 'undersocialized, troubled and bewildered,' and 'inclined to fantasize.' " *Id.* A psychologist testified that Stallings suffered from ADHD, had a below average IQ, and tended to be a follower. *Id.* Stallings also had a history of "very severe head injuries" and alcohol and drug abuse. *Id.*

{¶ 329} In an unsworn statement, Stallings expressed his remorse and sorrow to Shephard's family. *Id.*, 89 Ohio St.3d at 299, 731 N.E.2d 159. He expressed that he " 'never meant to kill' " her, and he asked the jury to spare his life. *Id.*

{¶ 330} The court assigned Stallings's "upbringing and difficult childhood" and youth some weight in mitigation. *Id.* at 300. It gave modest weight to Stallings's mental condition, limited intellect (below average IQ), remorse, adaptability to life in prison, and cooperation with police. *Id.* at 300-301. The court found that the aggravating circumstances outweighed the combined mitigating factors beyond a reasonable doubt and that the death sentence was appropriate. *Id.*

{¶ 331} The mitigation evidence presented in *Spivey*, *Raglin*, and *Stallings* is similar to Graham's mitigation. They all were young—between 18 and 20 years old—when they committed their offenses. Each suffered from varying mental-health issues. And all four men had had troubled childhoods. However, in this last regard, Graham's mitigation pales in comparison. He did not experience parental rejection or physical and verbal abuse or suffer as a result of substance abuse by the adults in his life. To the contrary, Graham's mother cared for him and attempted to get Graham the counseling help he needed. And he was provided the basic necessities of life, did not live in squalor, was adequately fed, and remained in school through the 11th grade, passing all his Ohio graduation test requirements.

{¶ 332} In *Spivey* and *Raglin*, the offenders' youth, history and background, mental health, and, in Raglin's case, other mitigating factors, did not overcome a single R.C. 2929.04(A)(7) aggravating circumstance. *Spivey*, 81 Ohio St.3d at 429, 692 N.E.2d 151; *Raglin*, 83 Ohio St.3d at 274, 699 N.E.2d 482. And in *Stallings*, the mitigating factors did not overcome two aggravating circumstances. Here, there are *three* aggravating circumstances: Graham committed aggravated murder during the course of an aggravated burglary, an aggravated robbery, and an aggravated kidnapping. Therefore, Graham's mitigation offers nothing that weighs more heavily against the aggravating circumstances of his offense than was offered in *Raglin*, *Spivey*, and *Stallings*.

{¶ 333} The majority contends that its position finds support in *Johnson*, 144 Ohio St.3d 518, 2015-Ohio-4903, 45 N.E.3d 208. But the majority gives only generalities about Johnson's mitigation evidence. However, as seen above, details matter.

{¶ 334} In *Johnson*, Rayshawn Johnson entered Shanon Marks's home and murdered her with a baseball bat in the course of committing burglary and robbery. *Id.* at ¶ 3, 8. Johnson received a new mitigation hearing after the Sixth Circuit Court of Appeals affirmed the granting of a writ of habeas corpus. *Id.* at ¶ 103-104. We recognized our previous holding that the state had proved two aggravating circumstances—aggravated robbery and aggravated burglary—beyond a reasonable doubt. *Id.* at ¶ 101, citing *State v. Johnson*, 88 Ohio St.3d 95, 114, 723 N.E.2d. 1054 (2000). We found that the applicable mitigating factors were the offender's youth (age 19 at the time of the offense), history and background, mental health, substance addiction, limited intellectual ability, remorse, adjustment to life in prison, and transformation since the offense. *Id.* at ¶ 130-136.

{¶ 335} Johnson's family life was truly dysfunctional. Marian Faulkner, Johnson's maternal grandmother, become pregnant with Johnson's mother, Demeatra Johnson, at 17. *Johnson*, 144 Ohio St.3d 518, 2015-Ohio-4903, 45

N.E.3d 208, at ¶ 108. Faulkner admitted that when she was raising Demeatra, alcohol was her priority, not parenting. *Id.* at ¶ 109. She regularly went to bars and drank so heavily that she passed out. *Id.*

{¶ 336} Demeatra began taking drugs by age nine and eventually exchanged "sex for drug money, rides in cars, and a place to stay." *Id.* at ¶ 110. At age 16, she became pregnant with Johnson. *Id.* at ¶ 111. She reportedly continued to consume drugs and alcohol while pregnant. *Id.*

{¶ 337} When Johnson was several months old, Demeatra moved with him to North Carolina to live with his father. *Id.* at ¶ 112. They lived in a shack that lacked electricity and water, and they did not always have food or diapers. *Id.* "Demeatra regularly put Johnson in a closet if he cried, sometimes for an entire day. She mashed up Percocet, Percodan, or heroin and put it in Johnson's bottle or applesauce so he would sleep. She also gave him beer." *Id.* Once, Demeatra was angry with Johnson's father for beating her and Johnson, so she set the bed on fire while Johnson's father was in it. *Id.*

{¶ 338} Demeatra and Johnson eventually returned to Ohio. *Johnson*, 144 Ohio St.3d 518, 2015-Ohio-4903, 45 N.E.3d 208, at ¶ 113. Demeatra got pregnant again and gave birth to another son; however, she continued to do drugs and neglect the boys. *Id.* Faulkner cared for her two grandsons, but she resented having to do so. *Id.* She eventually took formal custody of them. *Id.*

{¶ 339} Although Faulkner tried to be a good parent to her grandsons, alcohol was still more important to her. *Id.* at ¶ 114. She always had alcohol with her and "regularly experienced pounding headaches, hangovers, and blackouts, and drove drunk." *Id.* She stated that when she was hungover she would whip her grandsons with a leather belt and an iron cord and hit them with a bat. *Id.* Faulkner stopped drinking by the time Johnson was in middle school. *Id.*

{¶ 340} Demeatra was still involved in Johnson's life. *Johnson* at ¶ 115. When he was 12 or 13, "[s]he taught him how to drink, smoke marijuana, and cut,

cook, and deal cocaine." *Id.* Faulkner testified that by that point, Johnson was out of control: "[h]e disobeyed, caused trouble at school, stole, drank, and ran away." *Id.* He was repeatedly in court for offenses like drug abuse and stealing money. *Id.*

{¶ 341} An expert described Johnson's family as "very dysfunctional." *Id.*, 144 Ohio St.3d 518, 2015-Ohio-4903, 45 N.E.3d 208, at ¶ 119. Demeatra, Faulkner, and Johnson's great-grandmother each had mental-health issues, abused alcohol, and neglected and abused her children. *Id.* The expert "explained that this familial dysfunction likely caused a series of problems for Johnson, contributing to his mental-health problems and addiction." *Id.* at ¶ 120. Johnson was not taught the difference between right and wrong or how to make good choices, and he did not witness positive social interactions. *Id.* Rather, he was taught how to sell drugs and observed his mother exchanging sexual favors for drug money. *Id.*

{¶ 342} Johnson was diagnosed "with dependencies on alcohol and marijuana and with dysthymia, a form of depression most often found in people with dysfunctional family backgrounds." *Id.* at ¶ 122. The expert opined that Johnson's efforts at treatment for addiction were likely unsuccessful because he did not also receive treatment for his mental-health problems. *Id.* The expert described Johnson's use of alcohol and drugs around the time of Shanon's death as "excessive." *Id.* at ¶ 123.

{¶ 343} Johnson had a low average IQ (83) and did not perform well in school. *Id.* at ¶ 121. For a time, he took Ritalin for ADHD. *Id.* Johnson was placed in a special class after the schools he attended identified him as developmentally handicapped. *Id.*

{¶ 344} Testimony was also presented about Johnson's life since his conviction in 1998. *Id.* at ¶ 124. He had earned his GED and had held multiple jobs while in prison. During his 14 years of incarceration he had received only two incident reports, and neither of them had resulted in discipline. *Id.* He was also involved in a prison ministry. *Id.* at ¶ 127.

**{¶ 345}** Johnson's teenage son testified about his deep love for his father and their prison visits. *Johnson*, 144 Ohio St.3d 518, 2015-Ohio-4903, 45 N.E.3d 208, at ¶ 126. "He stated that Johnson counsels him to avoid drugs, stay in school, keep out of trouble, and be godly." *Id.* He expressed his desire to be able to continue to talk to his father and asked the jury not to impose the death penalty, saying, " 'That's all I got left.' " *Id.*

**{¶ 346}** In Johnson's unsworn statement, he "accepted full responsibility for his actions and offered his 'deepest and most sincere apology.' " *Id.* at ¶ 128. "He explained that he had been a different man 14 years before, one who relied on drugs and alcohol to escape reality. He had no father, only a drug-addicted mother who encouraged him to use drugs and alcohol." *Id.* Now, he said, he is sober, the Lord is present in his life, and he is trying to be a father to his son and counsel him against using drugs. *Id.* He expressed his belief that he could "mentor young men with addictions and help them learn to change." *Id.*

**{¶ 347}** Johnson stated that Shanon did not deserve to die and expressed his wish that he could bring her back. *Id.* at ¶ 129. He said that he prayed nightly for Shanon's family and recognized that his apology is not enough. *Id.* "Johnson asked for forgiveness and mercy and apologized again to both Shanon's family and his own." *Id.*

**{¶ 348}** Johnson also expressed remorse near the time of Shanon's murder. After he was arrested, he admitted to Faulkner that he had murdered Shanon. He cried, apologized, and said that he needed help because he is crazy. *Id.* at ¶ 116.

**{¶ 349}** The similarities between Graham and Johnson begin and end with the fact that they were 19 at the time of their offenses and expressed remorse for their actions—though Graham's expression of remorse was focused more on his own ability to learn from his mistakes than it was regret for what he had done. He said, in his extremely brief unsworn statement: "First off, I would like to say my heart goes out to the victim's family. Um, I know they probably can't forgive this,

but mistakes do happen and people do learn from mistakes and I just hope the jury will understand that and give me a chance to learn."

{¶ 350} We noted in *Johnson* that Johnson's dysfunctional upbringing doomed him from the start. *Id.,* 144 Ohio St.3d 518, 2015-Ohio-4903, 45 N.E.3d 208, at ¶ 137. The same cannot be said of Graham. Johnson's evidence of mental health and addiction issues is stronger. His intellectual ability was limited; Graham's is not. He suffered from a diagnosed mental illness; Graham does not. Johnson's mother trained him to be a criminal; Graham's did not. Finally, as 14 years had passed since the offense, the court considered testimony that Johnson had changed and had benefitted from being part of a structured prison environment.

{¶ 351} *Johnson* is no more on point than *Spivey* and *Raglin* are distinguishable. The majority merely offers a comparison of categories of mitigation, failing to discuss the substance of the mitigation offered by each defendant. However, it is the substance that matters.

> [E]vidence about the defendant's background and character is relevant because of the belief, long held by this society, that defendants who commit criminal acts that are attributable to a disadvantaged background, or to emotional and mental problems, may be less culpable than defendants who have no such excuse.

*Brown*, 479 U.S. at 545, 107 S.Ct. 837, 93 L.Ed.2d 934 (O'Connor, J., concurring). This is why "the individual assessment of the appropriateness of the death penalty is a moral inquiry into the culpability of the defendant, and not an emotional response to the mitigating evidence." *Id.*

{¶ 352} In this case, Nick had fully surrendered to Graham's demands, was sitting on the couch with his hands in the air, offering no resistance, and presenting no threat when he was killed. Nick had done nothing to escalate the violence.

Graham could have simply taken the money and marijuana and left. Instead, when Nick said, "You're not going to shoot me," Graham pulled the trigger of his .380-caliber High Point semiautomatic handgun and blew a hole in Nick's chest, killing him. Why? Because, as Graham put it to his coconspirators immediately afterwards, "He thought sh[—] was sweet and I wasn't playing." In other words, he murdered Nick because Nick doubted that Graham could be so inhumane as to kill him for no reason. This was a cold-blooded, senseless murder that Dr. Swales blames on Graham's self-described addiction to Xanax. But Graham displayed a disdain for human life for which no drug could be blamed.

{¶ 353} The aggravating circumstances are entitled to significant weight. By way of counterbalance, our case law dictates that the mitigating factors are entitled to nominal, little, weak, modest, or some weight, and the combined weight of the mitigating factors does not come close to the great weight of the aggravating circumstances in this case. The analysis offered by the majority in finding otherwise is not persuasive. This is a watershed case, and in all future death-penalty cases, we will be required to follow it with regard to the weight of mitigating factors. If the majority wishes to change how this court weighs aggravating circumstances and mitigating factors in death-penalty cases, then it should have the courage to say that that is what it is doing, instead of insisting that it is merely following precedent. The majority should fully develop its reasoning so that all of Ohio—judges, lawyers, victims' families, and would-be assailants—knows what is happening here and what the majority's holding means for the future. Without that explanation, today's result seems arbitrary.

{¶ 354} The majority fails to make the necessary moral inquiry today and instead, gives an emotional response to unconvincing and unsubstantiated testimony. This court has never overturned a death sentence in a case with so little mitigation. An inquiry into Graham's moral culpability exposes that the

aggravating circumstances outweigh the cumulative effect of the mitigating evidence beyond a reasonable doubt.

*D. Proportionality*

{¶ 355} As the United States Supreme Court has explained, "proportionality" traditionally refers to "an abstract evaluation of the appropriateness of a sentence for a particular crime." *Pulley v. Harris*, 465 U.S. 37, 42-43, 104 S.Ct. 871, 79 L.Ed.2d 29 (1984). And that court "has occasionally struck down punishments as inherently disproportionate, and therefore cruel and unusual, when imposed for a particular crime or category of crime." *Id.* at 43.

{¶ 356} Graham's sentence is not disproportionate in this traditional sense. It is well settled that it is constitutional to impose the death penalty for the commission of a murder in the course of a robbery. *McCleskey v. Kemp*, 481 U.S. 279, 306, 107 S.Ct. 1756, 95 L.Ed.2d 262 (1987); *Gregg v. Georgia*, 428 U.S. 153, 187, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976) (a death sentence is not invariably disproportionate to the crime of deliberate murder); *State v. Smith*, 80 Ohio St.3d 89, 123, 684 N.E.2d 668 (1997) ("Imposing the death penalty in this case is neither excessive nor disproportionate when compared with the penalty imposed in other cases of felony-murder during an aggravated robbery").

{¶ 357} The United States Supreme Court has recognized that the Eighth Amendment to the United States Constitution does not compel state courts to review death sentences to ensure that they are proportionate to the punishment imposed on others convicted of the same crime. *Pulley* at 43. This court has likewise rejected the argument that "proportionality review must encompass not only cases where the death penalty was sought, but cases where it could have been, but was not." *State v. Steffen*, 31 Ohio St.3d 111, 122, 509 N.E.2d 383 (1987).

{¶ 358} Nonetheless, the General Assembly has provided for a form of proportionality review. R.C. 2929.05(A) states that "[i]n determining whether the

sentence of death is appropriate, * * * the supreme court shall consider whether the sentence is excessive or disproportionate to the penalty imposed in similar cases."

{¶ 359} In *State v. Jenkins*, our first case to apply the statute, we explained that "R.C. 2929.05 does not require a comparison of sentences in non-capital murder cases for proportionality review." *Id.*, 15 Ohio St.3d 164, 209, 473 N.E.2d 264 (1984). And in *Steffen*, we clarified that "only convictions of a capital crime are relevant for comparison purposes," *id.* at 123, because "a court cannot make a meaningful proportionality review unless the pool of cases is restricted to those which the reviewing court has itself decided," *id.* "Comparison with cases not passed upon by the reviewing court would be unrealistic since the reviewing court could not possess the requisite familiarity with the particular circumstances of such cases so essential to a determination of appropriateness." *Id.*

{¶ 360} We have adhered to this interpretation of R.C. 2929.05(A) for decades. And we have consistently rejected arguments that we should revisit that interpretation. *E.g.*, *State v. Wilks*, 154 Ohio St.3d 359, 2018-Ohio-1562, 114 N.E.3d 1092, ¶ 249; *State v. Spaulding*, 151 Ohio St.3d 378, 2016-Ohio-8126, 89 N.E.3d 554, ¶ 183; *Sowell*, 148 Ohio St.3d 554, 2016-Ohio-8025, 71 N.E.3d 1034, at ¶ 151.

{¶ 361} The doctrine of stare decisis is fundamental to the rule of law. *Wampler v. Higgins*, 93 Ohio St.3d 111, 120, 752 N.E.2d 962 (2001). Adherence to prior precedent "promotes the evenhanded, predictable, and consistent development of legal principles, fosters reliance on judicial decisions, and contributes to the actual and perceived integrity of the judicial process." *Payne*, 501 U.S. at 827, 111 S.Ct. 2597, 115 L.Ed.2d 720. And stare decisis is most compelling when precedent involves statutory construction; courts often justify their "extraordinary reluctance to overturn statute-based precedents" by citing the legislature's prerogative "to correct erroneous interpretations of legislative intent." *Rocky River v. State Emp. Relations Bd.*, 43 Ohio St.3d 1, 6, 539 N.E.2d 103 (1989).

{¶ 362} But rather than "correct" our interpretation of R.C. 2929.05(A), the General Assembly has amended the statute twice since we construed it in *Jenkins* and *Steffen* and retained the same language requiring the court to "consider whether the sentence is excessive or disproportionate to the penalty imposed in similar cases." *See* Am.Sub.S.B. No. 1, 139 Ohio Laws, Part I, 1, 17; Am.Sub.S.B. No. 4, 146 Ohio Laws, Part IV, 7815, 7819; Sub.S.B. No. 107, 147 Ohio Laws, Part IV, 7435, 7436.

{¶ 363} We have long recognized that when the legislature amends a statute and retains language that has been construed by this court, it is presumed to have adopted our construction of the statute:

"Where a statute is construed by a court of last resort having jurisdiction, and such statute is thereafter amended in certain particulars, but remains unchanged so far as the same has been construed and defined by the court, it will be presumed that the Legislature was familiar with such interpretation at the time of such amendment, and that such interpretation was intended to be adopted by such amendment as a part of the law, unless express provision is made for a different construction."

*State v. Ferguson*, 120 Ohio St.3d 7, 2008-Ohio-4824, 896 N.E.2d 110, ¶ 25, quoting *Spitzer v. Stillings*, 109 Ohio St. 297, 142 N.E. 365 (1924), syllabus.

{¶ 364} In amending R.C. 2929.05(A), the General Assembly has not abrogated our holding that the statutory proportionality review does not require a comparison to sentences in noncapital murder cases. We are obligated to adhere to that construction today.

{¶ 365} The concurring opinion asserts that "[p]roportionality review in Ohio is woefully superficial and perfunctory" and that it fails "to comply with the

112

plain language of R.C. 2929.05(A)." Concurring opinion, ¶ 219. However, we have applied our interpretation of R.C. 2929.05(A) in reviewing the appropriateness of death sentences in countless cases, and if a change in the statute is to be made, it is up to the General Assembly to make it. Graham himself does not advocate for a new interpretation of this court's role in reviewing proportionality under R.C. 2929.05(A) but rather contends only that "[a] death sentence lacks proportionality when a trial court fails to review all other death penalty specification indictments throughout the state of Ohio." Yet even in support of that argument, he points to no evidence in the record and no sentences imposed in other cases supporting his claim that his death sentence is disproportionate.

{¶ 366} The concurrence states that "[e]ven a cursory review of the most recent appeals involving a fatal shooting during the course of a robbery shows that the death penalty is not usually sought, let alone imposed, for this type of crime." Concurring opinion at ¶ 231. But whether to charge the accused with capital specifications is a matter of prosecutorial discretion, and the concurrence makes little allowance for a difference in the facts of each case.

{¶ 367} The first case cited by the concurrence, *State v. Cannon*, tells us simply that "gunfire broke out in the apartment" during the robbery. *Id.*, 9th Dist. Lorain No. 19CA011536, 2020-Ohio-3765, ¶ 17. In *State v. Rogenski*, 7th Dist. Columbiana No. 18 CO 0019, 2020-Ohio-1360, ¶ 15, and *State v. Brown*, 7th Dist. Columbiana No. 18 CO 0025, 2019-Ohio-2717, ¶ 2, it was unknown whether the defendant or a codefendant was the principal offender, while in *State v. Snowden*, 2d Dist. Montgomery No. 27948, 2019-Ohio-2840, ¶ 5, a codefendant had admitted shooting the victim. *State v. Riggins*, 1st Dist. Hamilton No. C-180069, 2019-Ohio-3254, ¶ 3, and *State v. Walker*, 2d Dist. Montgomery No. 28111, 2019-Ohio-3121, ¶ 18, were cases involving multiple shooters. The state relied on circumstantial evidence in *State v. Ocasio*, 5th Dist. Licking No. 2019 CA 00013, 2019-Ohio-

5396, and *State v. Mondie*, 8th Dist. Cuyahoga No. 108030, 2019-Ohio-5337, and the evidence in *State v. Johnson*, 8th Dist. Cuyahoga No. 107427, 2019-Ohio-2913, ¶ 23, showed only that the accused aided and abetted the murder. And in *State v. Hale*, 8th Dist. Cuyahoga No. 107646, 2019-Ohio-3276, the defendant had a colorable claim of self-defense.

{¶ 368} My point is not to distinguish all of these cases from Graham's but rather to show that there may be numerous considerations that affect the prosecutor's charging decisions, many of which will not be apparent from an appellate court's opinion or even from the record. Considerations might include the prosecutor's evaluation of the evidence and witness credibility, the existence of direct evidence of guilt, and the relative culpability of the accused and the existence of mitigation factors that might weigh against seeking the death penalty. Judicial opinions usually do not provide that information, especially when the sufficiency of the evidence is not an issue. This is why this court concluded in *Steffen* that "a court cannot make a meaningful proportionality review unless the pool of cases is restricted to those which the reviewing court has itself decided." *Id.*, 31 Ohio St.3d at 123, 509 N.E.2d 383. "Comparison with cases not passed upon by the reviewing court would be unrealistic since the reviewing court could not possess the requisite familiarity with the particular circumstances of such cases so essential to a determination of appropriateness." *Id*.

{¶ 369} The same flaw undermines the concurrence's assertion that there is a disproportionate number of death sentences in cases involving black defendants and white victims. How are we to know the race of the accused and the victim without examining the record in each comparable case? How does this court have the capacity to compare objectively the sentences imposed in all cases involving murders committed during the course of a robbery? How can this court fairly decide which offender was appropriately charged with capital specifications and which was not?

**{¶ 370}** The concurring opinion does not answer these questions and instead simply concludes: "The death penalty must be reserved for only the worst among murder offenses. * * * The murder in this case was cold, heartless, and senseless, but it is not the kind of murder offense for which the death penalty is appropriate." Concurring opinion at ¶ 233.

**{¶ 371}** The United States Supreme Court has held that "[c]apital punishment must be limited to those offenders who commit 'a narrow category of the most serious crimes' and whose extreme culpability makes them 'the most deserving of execution.' " *Roper*, 543 U.S. at 568, 125 S.Ct. 1183, 161 L.Ed.2d 1, quoting *Atkins v. Virginia*, 536 U.S. 304, 319, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002). But the General Assembly has established the system for determining when offenders are the worst of the worst by setting forth the crimes that merit capital punishment and by requiring the weighing of aggravating circumstances and mitigating factors. The concurring opinion takes issue with the policy choices that the General Assembly has made. But absent a showing that Ohio's death-penalty statutes are unconstitutional, this court lacks authority to second-guess the legislature's public-policy decisions, and it should not do so in the guise of a proportionality review.

**{¶ 372}** Applying R.C. 2929.05(A) as we have for decades allows us to decide the issue whether Graham's sentence is proportional to his crimes. This court has affirmed death sentences imposed on other defendants who were 19 years old when they committed murder and who were found guilty of a robbery-murder aggravating circumstance. *State v. Myers*, 154 Ohio St.3d 405, 2018-Ohio-1903, 114 N.E.3d 1138; *State v. McNeill*, 83 Ohio St.3d 438, 700 N.E.2d 596 (1998); *State v. Woodard*, 68 Ohio St.3d 70, 623 N.E.2d 75 (1993). The death sentence imposed in this case is therefore not disproportionate to sentences imposed in similar cases.

**{¶ 373}** For these reasons, I concur in judgment only in part and dissent in part.

DEWINE, J., concurs in the foregoing opinion except for paragraphs 246-257 and 263.

_____

Victor V. Vigluicci, Portage County Prosecuting Attorney, and Pamela J. Holder, Assistant Prosecuting Attorney, for appellee.

Donald Hicks; and the Law Office of Donald Gallick, L.L.C., and Donald Gallick, for appellant.

_____